. . . . . . . . . . . . . . . . . . . . . . . . . X

In the Matter of the Claim of:

ANDREW R. BOTTARI,

                       Claimant,

-against-

THE VILLAGE OF ARDSLEY, COUNTY OF
WESTCHESTER, ARDSLEY POLICE OFFICER MICHAEL
STEVENSON, SERGEANT FISHER, ET AL.

                       Respondent.

. . . . . . . . . . . . . . . . . . . . . . . . . X

HELD AT:   Boeggeman, George, Hodges
           & Corde, P.C.
           Office & Post Office Address
           11 Martine Avenue 9th Floor
           White Plains, New York 10603
           August 15, 2006 2:20 p.m.

        An Examination Under Oath of

the Claimant, ANDREW R. BOTTARI, held

pursuant to Section 50-H of the General

Municipal Law of the State of New York, at

the above time and place, before a Notary

Public of the State of New York.

          J & L REPORTING SERVICE
            of Westchester, Inc.
             200 East Post Road
         White Plains, New York 10601
              (914) 682-1888
          Nancy P. Tendy, Reporter

---

                                          2

A P P E A R A N C E S :

    ROCCO F. D'AGOSTINO, ESQUIRE
    Attorney for the Claimant
    Andrew R. Bottari
    Office & Post Office Address
    445 Hamilton Avenue Suite 607
    White Plains, New York 10607


    BOEGGEMAN, GEORGE, HODGES
    & CORDE, P.C.
    Attorneys for the Respondents
    Village of Ardsley, et al.
    Office & Post Office Address
    11 Martine Avenue 9th Floor
    White Plains, New York 10603
    BY:  REGINA VOLYNSKY, ESQUIRE

---

              A. R. BOTTARI           3

        ANDREW R. BOTTARI, residing at

10 Springwood Avenue,

Ardsley, New York 10502,

having been duly sworn by

Notary Public Nancy P. Tendy,

testified as follows:

EXAMINATION BY MS. VOLYNSKY:

      Q.    I'm going to just quickly -- my
name is Regina Volynsky. I'm an attorney
that represents the Respondents in this
action, The Village of Ardsley, County of
Westchester, Ardsley Police Officer Michael
Stevenson, and Sergeant Fisher.
           I'm going to ask you a series
of questions regarding your Notice of Claim.
If you don't understand a question, just ask
me to repeat it. If you need a break, just
let me know and we'll take a break?
      A.    Okay.
      Q.    If you have any questions, let
me know.
      A.    All right.
      Q.    I think you just said for the
record, can I get your full name?

---

              A. R. BOTTARI           4

      A.    Yes, Andrew Bottari.
      Q.    Do you have a middle initial?
      A.    R.
      Q.    Is that --
      A.    -- Richard.
      Q.    Your date of birth?
      A.    7-26-66.
      Q.    Your Social Security number?
      A.    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.
      Q.    You stated that your residence
was 10 Springwood Avenue in Ardsley, New
York.
      A.    That's correct.
      Q.    How long have you been there?
      A.    Five years.
      Q.    Where were you prior to that?
      A.    Hartsdale.
      Q.    Do you recall the actual
address?
      A.    Yeah, 1501 Fox Glen Drive.
      Q.    Are you currently married?
      A.    Yes.
      Q.    How long have you been married?
      A.    Let me -- nine years this

```
                   A. R. BOTTARI                    5
```

September.

    Q.    I was going to ask a separate question, the date of your marriage?

    A.    September 8, 1998. No. I'm sorry. 1997.

    Q.    Do you have any children?

    A.    Yes.

    Q.    How old?

    A.    Seven and eight.

    Q.    Their names?

    A.    Paul and Olivia.

    Q.    Your highest level of education?

    A.    Professional school, three years of law school.

    Q.    Where did you go to law school?

    A.    Brooklyn.

    Q.    When did you graduate?

    A.    1998.

    Q.    Are you admitted to the Bar?

    A.    Yes.

    Q.    Of which state?

    A.    New York.

    Q.    New York only?

```
                   A. R. BOTTARI                    6
```

    A.    Yes.

    Q.    What year did you get admitted?

    A.    '99.

    Q.    Are you currently employed?

    A.    Self-employed.

    Q.    Self-employed. How long have you been self-employed?

    A.    Three years.

    Q.    Where? What's your office location?

    A.    445 Hamilton Avenue, Suite 607, White Plains.

    Q.    What kind of work do you do?

    A.    Criminal defense, real estate transactions.

    Q.    Prior to being self-employed, were you somewhere else?

    A.    Yes.

    Q.    Where were you?

    A.    King County District Attorney's Office for five years.

    Q.    Were you at Kings County right out of law school?

    A.    Yes.

```
                   A. R. BOTTARI                    7
```

    Q.    The reason for leaving the Kings County D.A.'s Office?

    A.    I was ready to move on.

    Q.    In preparation for today's hearing, did you review any documents, writings, diaries, photos, notes, records, anything of that nature?

    A.    No, I didn't.

    Q.    Let's get to why we're here.

    A.    Okay.

    Q.    On March 3, 2005, where were you?

    A.    At what time?

    Q.    The Notice of Claim, the Notice of Claim doesn't specify, so let's start with 725 Saw Mill River in Ardsley, New York. Is that a private residence or something else?

    A.    It's a commercial location. There's a row of stores there, and it's a parking lot.

    Q.    Is there a particular store that you were in front of or when?

    A.    Yeah, there's CVS.

```
                   A. R. BOTTARI                    8
```

    Q.    What time of day were you at the shopping center?

    A.    I was there probably around 11:45 p.m. 'til about 12:15, 12:20. Depends on what time the police got to the location.

    Q.    Was the CVS opened at that time?

    A.    No. It was closed.

    Q.    Were any of the stores in the shopping center opened at the time?

    A.    No.

    Q.    Were you a pedestrian? Were you in a motor vehicle?

    A.    I was in a car.

    Q.    In the car. When you were in the car, where was the car located in relationship to the CVS?

    A.    All right, so if you're looking at the parking lot end of stores, I was towards the northern ends of where the stores were in the north ends of the parking lot. So, at that ends it's a CVS, but it's bricked off there. You can't really see in or anything, like, sort of the ends, ends of

A. R. BOTTARI                9

CVS.

Q. Were you alone?

A. Yes.

Q. Were there any other cars surrounding you?

A. No.

Q. Can you describe what you were doing in the parking lot?

A. Well, it was a couple of things. I was sitting in my car, listening to music, and that's essentially it.

Q. Can you describe your car?

A. Yeah. It's a 2004 GMC Denali. It's an SUV.

Q. Can you describe the position of your vehicle in relationship to the CVS when the police officer approached you?

A. It was backed in, so the tail end of my vehicle would be towards the wall of CVS.

Q. You were in the vehicle at the time?

A. Actually, I was -- I saw the police officer drive by, and I was out of

---

A. R. BOTTARI                10

the vehicle. And then when he pulled up, I went to get back inside.

Q. At any time prior to the police officer approaching your vehicle or that you noticed the police officer approaching your vehicle, was the trunk of your vehicle opened?

A. Yes.

Q. At any time after seeing the police officer, did you close the trunk of your vehicle?

A. Yeah, because I was getting back into my car.

Q. March 3, 2005, we're going from the time the police officers arrived is approximately you said after 12:00, around 12:20, somewhere in that vicinity?

A. Yeah.

Q. Can you describe the temperature outside?

A. It was cool. I was wearing a jacket.

Q. Can you describe your jacket?

A. Black, above my knees, but

---

A. R. BOTTARI                11

below my waist, so I guess --

Q. -- three-quarter length?

A. Three-quarter length.

Q. Did your jacket have pockets?

A. Yes.

Q. How many?

A. Two front pockets.

Q. Were you wearing gloves?

A. No.

Q. Were you wearing a hat or a cap?

A. No.

Q. Were you wearing sneakers, boots, something else?

A. I don't remember what I was wearing. It was casual, though.

Q. Was there anyone else in the car with you?

A. No.

Q. Your wife was not with you at the time?

A. No. She was home.

Q. At any point did the officer get out of his vehicle and approach you?

---

A. R. BOTTARI                12

A. Yes.

Q. Do you recall what, if anything, the police officer said to you?

A. He, in sort of an accusatory tone, asked me what was I doing here.

Q. Did you respond to the police officer?

A. I said, I'm not doing anything. I'm just, you know, here, listening to music.

Q. At any time did the police officer ask for your name?

A. Yeah.

Q. Did you give him your name?

A. I asked him why do you need -- again, using, you know, a sort of very stern -- I can't really describe the tone, but it was sort of accusatory, and he said, what's your name? Where do you live? I said, why do I have to give you this information? I'm not doing anything wrong here, and do you have any.

Q. At any point, did a second police officer arrive?

```
                    A. R. BOTTARI                14
     A.     Two minutes.
     Q.     Two minutes, okay.  When the
second police officer arrived, what happened
next?
     A.     They both got out of their
vehicles, and they approached me, but they
were, maybe, ten feet.  One -- they were
shaped sort of like a "V."  I'm, like, the
head of the "V", and they were on either
side of me in front of me, and my hands were
in my pocket.  And they demand that I take
my hands out of my pocket.  I said, why do
you want me to take my hand out of the
pocket?  For safety reasons.  I said, okay,
before I pull them out, I'm going to let you
know I have my wallet in one pocket, and my
phone in the other pocket, and I slowly
pulled, slowly pulled my hands out and put
my hands up like this.
     Q.     Can you tell me approximately
how many times were you asked to remove your
hands from your pockets?
     A.     Real quick.  When I say like
this, I mean my hands came up to about my
```

```
                    A. R. BOTTARI                15
shoulders when I pulled my hands out of my
pockets.  Can you repeat the question?
     Q.     Sure.  Approximately how many
times were you asked by either or both of
the police officers to remove your hands
from your pocket?
     A.     One time.
     Q.     One time.
     A.     Yeah.
     MR. D'AGOSTINO:  Is there a
question pending?
     MS. VOLYNSKY:  No.
     MR. D'AGOSTINO:  Let me talk to
my client.
     MS. VOLYNSKY:  Sure.
(Off-the-Record discussion was held outside
          of the room.)
     Q.     So, you were -- I'm just going
to recap what you just said so I can
continue with my train of thought.
     A.     All right.
     Q.     You just stated that you were
asked once to remove your hands from your
pockets?
```

```
                    A. R. BOTTARI                16
     A.     Yes.
     Q.     You stated that in response you
took your hands out of your pockets slowly,
and what was in your pocket?
     A.     My wallet and my cell phone.
     Q.     Can you describe your wallet?
     A.     Black.
     Q.     Black wallet?
     A.     Yes.
     Q.     And your cell phone, what that
looked like?
     A.     Probably black as well.
     Q.     At any time did you ever have a
silver object in your pocket?
     A.     No.
     Q.     At any point did the cops ask
you what you were doing at the CVS?
     A.     They just, well, Officer
Stevenson asked me what I was doing, but
just let me backtrack again.  Before, before
Sergeant Fisher pulled up, when Officer
Stevenson was questioning me, I said,
listen, I don't have to answer any of these
questions.  I'm not doing anything wrong.  I
```

```
                    A. R. BOTTARI                17
attempted to get back in my vehicle and
drive away, and at that point, he said
you're not doing going anywhere.  And at
that point, he blocked my vehicle with his
vehicle.  At that point he called Sergeant
Fisher.  That's when a short time later, a
few minutes or so, Sergeant Fisher pulled up
and then this other part that we're talking
about.
     Q.     Sure.  At any point, did you
tell the officers that you were an attorney?
     A.     Yeah, I did.
     Q.     Why did you tell them you were
an attorney?
     A.     'Cause I was really scared
'cause they were grabbing me, and it was
after I pulled my hands up, they each
approached me from both sides.  And I'm
asking them, what are you guys doing?  What
are you guys doing?  And I said look, I'm a
former D.A.  I'm an attorney.  At which
point, I was thrown to the ground, and my
face struck, my upper portion of my left eye
struck the asphalt and --
```

```
                    A. R. BOTTARI                    18
     Q.   -- I'm going to ask you to stop
right there.
     A.   Am I giving too much
information?
     Q.   I'll go through a series.
We'll get there.
     A.   Okay.
     Q.   I promise we will get there.
     A.   So, what was your question
then?
     Q.   My question to you is: Did the
officers ever ask you what you were doing at
CVS?
     A.   They asked me. Well, Stevenson
asked me what am I doing here. I said
nothing, you know.
     Q.   At any point did the cops ever
state to you that they needed to see what
was in your pockets because they were
concerned for their safety?
     A.   They told me to take my hands
out of my pockets, and I asked them why.
For safety purposes. But as far as
answering your question, no, they didn't ask
```

```
                    A. R. BOTTARI                    19
if there was anything in my pockets.
     Q.   At any point did the police
officers try to pat you down to check for
weapons?
     A.   They grabbed my arms and threw
me to the ground. Whether they were patting
me down at that point. They didn't -- if
you're asking me did they put me up against
the car and pat me down, frisk me?
     Q.   I'm asking if they either asked
you to put your hands up, so they could
frisk you down to check for weapons. I
don't know if they needed to put you up
against the car. They could have but?
     A.   They asked. I think they did.
     Q.   They did, okay. At any point
you said that the officer grabbed your hands
or just grabbed you?
     A.   They grabbed different parts of
my body, my arms.
     Q.   Can you describe which parts of
your body?
     A.   It was a little -- it was my
arms and my shoulders.
```

```
                    A. R. BOTTARI                    20
     Q.   Were you facing the officers,
or was your back facing towards them when
they grabbed your arms and your shoulder?
     A.   I was facing them.
     Q.   At any point were you
handcuffed?
     A.   Yes.
     Q.   What happened when you were
handcuffed?
     A.   This is after they had gotten
me to the ground. He -- one of them was
grabbing twisting my arm. I'm not
resisting. You can have my arm. You can do
with it as you please. And, yes, they did
handcuff me, and they left me face down on
the parking lot floor.
     Q.   At any point were you the only
one that fell to the floor, or did the
officers fall as well?
     A.   They fell on top of me.
     Q.   They did?
     A.   I don't know if they fell. I
mean I was thrown to the ground really,
literally thrown to the ground. I tried to
```

```
                    A. R. BOTTARI                    21
step back because I didn't understand what
they were doing. Then I finally realized
after I was thrown to the ground. They fell
on top of me. I'm not going to say pounced
on top of me, but they definitely landed on
top of me.
     Q.   They landed on you?
     A.   Yeah, both of them.
     Q.   Did the officers ever punch
you?
     A.   Well, I did get an elbow to the
back of my head, though.
     Q.   Were you ever scratched by the
officers?
     A.   I received stitches in my eye.
     Q.   You weren't physically
scratched by the officers, though?
     A.   I did have -- actually I did
have injuries. Was I scratched with their
nails?
     Q.   Yes.
     A.   Clawed, no, I don't think so.
     Q.   Were you hit by the officers?
     A.   I think I was elbowed in the
```

```
                    A. R. BOTTARI                22
 back of my head.  I'm not going to say.
        MR. D'AGOSTINO:  Is there a
    question pending?
        MS. VOLYNSKY:  No.
        MR. D'AGOSTINO:  Good, let me
    talk to him.
    (Off-the-Record discussion was held outside
                of the room.)
    Q.    I'm going to back a little bit.
    A.    Okay.
    Q.    When you took your hands out of
 your pockets, you did it slowly or fast?
    A.    I did it slowly because I know
 -- okay, go ahead.
    Q.    After at some point, did you
 put your hands back into your pockets?
    A.    No.
    Q.    After you fell to the ground,
 did the cops take you to the precinct, or
 was an ambulance called?
    A.    An ambulance was called 'cause
 there was blood gushing out of my head.
    Q.    Out of your head or out of your
 eye?
```

```
                    A. R. BOTTARI                23
    A.    Above my eye.
    Q.    Which hospital were you taken
 to?
    A.    Dobbs Ferry Community Hospital.
    Q.    Were you seen by a doctor
 there?
    A.    Yes.
    Q.    Do you know the name of the
 doctor?
    A.    No.
    Q.    Did you require stitches?
    A.    Yes.
    Q.    How many?
    A.    Four.
    Q.    Were you given any medication,
 prescription medication for pain?
    A.    I don't remember.
    Q.    After, you were you released
 from Dobbs Ferry that same I guess early
 morning?
    A.    Yes, I was.
    Q.    Approximately do you know what
 time you were released from the hospital?
    A.    No.
```

```
                    A. R. BOTTARI                24
    Q.    Was it you know 6:00 o'clock in
 the morning?  Was it only a couple of hours
 after?
    A.    Probably about an hour to two
 hours after I was brought there.
    Q.    After you left Dobbs Ferry
 Hospital, where were you taken?
    A.    Ardsley Police Station.
    Q.    While you were at Ardsley
 Police Station, were you charged with
 anything?
    A.    Yes.
    Q.    Do you know what you were
 charged with?
    A.    Disorderly Conduct and
 Resisting Arrest -- I don't know what the
 third charge.
        MR. D'AGOSTINO:  Can I
    interject.
        MS. VOLYNSKY:  Yes.
        MR. D'AGOSTINO:  Obstruction of
    Governmental Administration of
    Justice.
        THE WITNESS:  That's right,
```

```
                    A. R. BOTTARI                25
 thanks.
    Q.    Was there ever a Hearing done
 as a result of these charges?
    A.    Yes.
    Q.    When was that hearing?
    A.    I don't recall when it was
 done.
    Q.    Would your Counsel know?
    A.    Do you want me to explain?
    Q.    I'm just looking for a date
 right now.
        MR. D'AGOSTINO:  Sure.  There
    was a Suppression Hearing on October
    27, 2005, at 8:23 p.m.  There was
    also a Motion that resulted in a
    Dismissal of all the charges.
        MS. VOLYNSKY:  October 27th of
    '05?
        MR. D'AGOSTINO:  Correct.
    Q.    At the Suppression Hearing were
 you represented by Counsel?
    A.    Yes.
    Q.    Who was your Counsel?
    A.    Rocco D'Agostino.
```


```
                          A. R. BOTTARI                    26
```

Q. Is this the Counsel that is sitting with you here, today?

A. Yes.

Q. Was there an arraignment of your charges for your charges?

A. Yes, there was.

Q. Were you represented by Counsel at the arraignment?

A. Yes.

Q. Was that Rocco D'Agostino?

A. Yes.

Q. Counsel had just stated that there was a motion done; is that correct?

MR. D'AGOSTINO: Yes.

Q. As a result of the motion, all the charges were dismissed?

A. Yes.

Q. When were the charges dismissed? Was there an Order?

MS. VOLYNSKY: Can I admit that as Respondent's "A".

MR. D'AGOSTINO: But you need to copy it. That's my only copy.

MS. VOLYNSKY: That's fine.

```
                          A. R. BOTTARI                    27
```

Let me just take a look at it. Why don't we put this in as Respondent's "A".

MR. D'AGOSTINO: Do you want just the Court's Order?

MS. VOLYNSKY: That would be great.

MR. D'AGOSTINO: This is one from the Court, but still I need it copied.

MS. VOLYNSKY: We're going to mark as -- this is copy of the Opinion and Decision and Order from the Justice Court of the Village of Ardsley, County of Westchester. It's an Order dismissing the charges against Andrew R. Bottari B-O-T-T-A-R-I, signed by Walter Schwartz, who's the Village Justice.

(Respondent's Exhibit "A" was marked for Identification.)

Q. Based upon, I just have a quick question. Based upon one of the Judge's statements, the charges were dismissed based

```
                          A. R. BOTTARI                    28
```

on someone exceeding a 90 day statutory period for charges --

MR. D'AGOSTINO: -- I'm just going to object. Although he's an attorney he's testifying here today as a lay person; and the document speaks for itself.

MS. VOLYNSKY: I'm going to hold onto it right here. We'll make a copy of it and then we'll give it back to you.

MR. D'AGOSTINO: Okay.

Q. After you were taken to Ardsley Police Station, you were charged, and then you were released?

A. I was put in a cell for a couple of hours. Then I was given tickets and then I was released.

Q. I'm going to go back to the medical. After you came back from the police station, did you ever seek any further medical attention other than the attention that was given to you at the hospital?

```
                          A. R. BOTTARI                    29
```

A. No.

Q. Did you ever return to the doctor to have your stitches removed?

A. I don't think so, but I did -- I mean when you say medical attention, do you mean medical attention from a doctor 'cause I did have, like, some wounds on my body that I treated myself. I don't remember where they were at that point.

Q. But you didn't go to any other doctors to seek medical attention --

A. No.

Q. -- for the injuries you sustained?

A. Not professional medical attention.

Q. What about in your Notice?

MS. VOLYNSKY: Okay, I'll mark this as Respondent's Exhibit "B."

(Respondent's Exhibit "C" was marked for Identification.)

Q. Respondent's Exhibit "B" is your Notice of Claim. Can you read that over, and let me know if all of that

A. R. BOTTARI    30

information is correct, or if you would like to change anything in there?

A. No.

Q. Everything's fine in the Notice of Claim?

A. Nothing.

Q. I've a third page. I apologize. Is this your signature on the Notice of Claim and, actually, on the individual certification, I have one that's notarized and one that isn't?

A. Yes.

Q. Can you tell me what you're claiming as damages and/or injuries as a result of this incident?

A. False Arrest, Loss of Reputation, False Imprisonment. I don't know what else. There's probably other ones that are listed on it -- Assault & Battery, Infliction of Emotional Harm, Deprivation of Constitutional Rights, Violation of Civil Rights, medical expenses, psychological expenses, prima facie tort, malicious prosecution, et cetera. Also, yeah, and

---

A. R. BOTTARI    32

when you were at the hospital did they take blood from you?

A. I don't recall.

Q. Can you describe you stated that you had a loss of reputation. Did you lose a job as a result of this?

A. Well --

Q. -- answer it yes or no. Sorry.

A. I really -- loss of reputation?

Q. Did you lose a job as a result of this incident?

A. Yeah.

MR. D'AGOSTINO: I just want to object to the form of the question. By losing a job may imply that you're working as an employee of someone when he clearly stated he was self-employed at the time.

MS. VOLYNSKY: He could have said at the time --

MR. D'AGOSTINO: However, the words of "lose a job" could apply for somebody that's self-employed that he lost, a client he lost.

---

A. R. BOTTARI    33

MS. VOLYNSKY: I was going to continue on, but you needed to answer yes or no.

Q. Did you lose a job as a result of this incident?

A. Yeah, well, I have a job. Meaning, like, being employed by somebody?

Q. Yes.

A. No.

Q. Did you lose clients as a result of this incident?

A. I think I did. And you want me to articulate? When I do 18B work, it's sort of legal aid for people that don't have money to defend themselves in criminal matters. It's not Legal Aid Society, but you're an independent contractor. And I am permitted to go into the Ardsley Court and do work in that court, but because of this incident, I didn't go in there so and pick up any cases. So, specifically I can't name clients that I lost, but I can say that I did lose business that I could have had.

Q. Can you put a dollar amount on

---

A. R. BOTTARI    34

the amount of business you lost?

MR. D'AGOSTINO: Can you leave a space in the record. We'll supply that to you.

MS. VOLYNSKY: Sure.

A. _____

MR. D'AGOSTINO: The same with the medical records, to the extent he can locate any bills, we'll certainly provide you with that information.

A. _____

Q. Would you know about how much attorney's fees you incurred in defending the charges against you?

A. Almost twenty thousand dollars worth of attorney's fees.

Q. Have you ever been arrested before this incident?

A. Yes.

Q. How long ago?

A. 1993. I was in college, and I was stopped for DWI.

Q. Is that the only time you were ever arrested?

```
                A. R. BOTTARI                37
```

medics. One is a dentist in my town who knows everything in my town.

Q. Okay. I'm going to stop you right there. Can you give me the name of the medic?

A. One is Mr. Clear. I don't know his first name. I just know him from being a teacher in high school who's very active in the community. And also Charles Strict S-T-R-I-C-T I believe. And Charles Strict has children the same age as me who play soccer, play ball. This whole thing in my community that people have This -- as a matter of fact, this thing was published in the Enterprise which is a local newspaper.

Q. In the police blotter?

A. Yeah, basically a 38 year old man at 3:15 in the morning arrested in the Ardsley Village and named the charges. So, I don't understand, it's just coming out. I'm starting to recall how much this really irritated me at the time, not only irritated me, just really got to the core of who I am.

Q. Just to go back, you said you

```
                A. R. BOTTARI                38
```

grew up in Ardsley?

A. Yeah.

Q. Did you go to high school there?

A. Yeah.

Q. Where did you go to college?

A. Vassar College.

Q. You went straight from Vassar to Brooklyn Law School?

A. Correct, but I didn't go to college right from high school.

Q. Did you take some time off?

A. Yeah.

Q. Did you do something else?

A. Four years I took off.

Q. What did you do?

A. I was in the Marine Corps for four years.

Q. Were you aware of any signs in the parking lot of the CVS parking lot of 725 Saw Mill River in Ardsley that said, No Loitering, No trespassing, anything to that effect?

A. No. And I could tell you that

```
                A. R. BOTTARI                39
```

people -- no, no, I don't remember any signs.

Q. Do you currently own a dog?

A. Yes.

Q. What kind?

A. One's a pit bull and one's a Pekingese.

MS. VOLYNSKY: Okay, I'm done.

THE WITNESS: Okay.

(Examination concluded at 3:05 p.m.)

_____
ANDREW R. BOTTARI

Sworn and subscribed to
before me this _____
day of _____, 2006.

_____
Notary Public

```
                                              40
```

C E R T I F I C A T I O N

STATE OF NEW YORK        )
                         )  Ss.
COUNTY OF WESTCHESTER    )

I, NANCY P. TENDY, Court Reporter and Notary Public within and for the County of Westchester, State of New York, do hereby certify:

THAT THE Witness, ANDREW R. BOTTARI, whose testimony is hereinbefore set forth was duly sworn by me, and that such transcript is a true record of the testimony given by such witness.

AND, I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of August, 2006.

*Nancy P. Tendy*

_____
NANCY P. TENDY
Court Reporter

## RESPONDENT'S EXHIBITS

| Respondent's Exhibits | Description | Page Number |
|---|---|---|
| A | Opinion, Decision & Order | 27 |
| B | Notice of Claim | 29 |