```
- - - - - - - - - - - - - - - - - - - - -X
IN THE MATTER OF THE CLAIM OF

ANDREW R. BOTTARI,

                    Claimant,

        -against-

THE VILLAGE OF ARDSLEY,
COUNTY OF WESTCHESTER,
ARDSLEY POLICE OFFICER MICHAEL
STEVENSON, SERGEANT FISCHER,
ET AL.,

                    Respondents.
- - - - - - - - - - - - - - - - - - - - -X
                         148 Martine Avenue
                         White Plains, New York
                         August 16, 2006
                         2:00 p.m.


        EXAMINATION OF ANDREW R. BOTTARI, the

Claimant herein, held pursuant to a Notice,

pursuant to Section 50-H of the General Municipal

Law and Stipulations of Adjournment, held at the

above time and place, before a Notary Public within

and for the State of New York.




                 CARBONE & ASSOCIATES, LTD.
                         Lisa Blute
                  111 North Central Park Avenue
                     Hartsdale, New York  10530
                        (914) 684-0201

                         COPY
```

---

**Page 2**

1    A P P E A R A N C E S:

2

3    ROCCO D'AGOSTINO, ESQ.

4    Attorney for the Claimant

5    445 Hamilton Avenue, Suite 607

6    White Plains, New York  10601

7

8    CHARLENE M. INDELICATO, ESQ.

9    WESTCHESTER COUNTY ATTORNEY

10   Attorney for the Respondents

11   148 Martine Avenue - 6th Floor

12   White Plains, New York  10601

13   BY:  SHANNON BRADY, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 3**

```
1          IT IS HEREBY STIPULATED AND AGREED, by and

2    between the attorneys for the respective parties

3    hereto, that this examination may be sworn to

4    before any Notary Public.

5

6          IT IS FURTHER STIPULATED AND AGREED that

7    the filing and certification of said examination

8    shall be waived.

9

10         IT IS FURTHER STIPULATED AND AGREED that

11   all objections to questions, except as to form,

12   shall be reserved for the time of trial.
```

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 4 — Andrew R. Bottari**

```
1    A N D R E W  R.  B O T T A R I, the Claimant

2    herein, after having been first duly sworn by Lisa

3    Blute, a Notary Public of the State of New York,

4    was examined and testified as follows:

5    EXAMINATION BY MS. BRADY:

6          Q     Please state your name and address

7    for the record?

8          A     Andrew R. Bottari, 10 Springwood

9    Avenue, Ardsley, New York 10502.

10         Q     Good afternoon, Mr. Bottari.  My

11   name is Shannon Brady and I represent the County of

12   Westchester.  I'm going to be asking you some

13   questions about a claim that you filed against

14   Ardsley and the County of Westchester.  If you

15   don't understand my question, please let me know

16   and I'll repeat it or rephrase it.  I just ask that

17   all your answers be verbal, because the court

18   reporter cannot take down a shake or nod of the

19   head.  Okay?

20         A     Yes.

21         Q     What does the "R" stand for?

22         A     Richard.

23         Q     The address on Springwood Avenue,

24   is that a private home?

25         A     Yes.
```

Andrew R. Bottari  5

```
1    Q    How long have you lived there?
2    A    Five, six years.
3    Q    Do you live there with anyone?
4    A    With my wife and two children.
5    Q    What is your wife's name?
6    A    Michelle.
7    Q    Bottari?
8    A    Yes, all have the same last name.
9    Q    What are your children's names and
10   ages?
11   A    Olivia, 8; Paul, 7.
12   Q    Where did you live before
13   Springwood Avenue?
14   A    1501 Fox Clinton Drive, Hartsdale,
15   New York 10530.
16   Q    How long did you live there?
17   A    Two years.
18   Q    Are you currently employed?
19   A    I'm self-employed.
20   Q    What are you self-employed as?
21   A    As an attorney.
22   Q    Do you have a firm?
23   A    Yes, I do.
24   Q    What is the name of the firm?
25   A    Bottari and Associates, PC.
```

Andrew R. Bottari  6

```
1    Q    Do you have an office?
2    A    Yes, I do.
3    Q    Where is that?
4    A    445 Hamilton Avenue, Suite 607,
5    White Plains, New York 10601.
6    Q    Do you have any partners?
7    A    No.
8    Q    It's Bottari and Associates?
9    A    It's me.
10   Q    How long have you been practicing?
11   A    On my own or practicing in general?
12   Q    In general?
13   A    I started practicing in 1998.  I
14   was a prosecutor in the King's County District
15   Attorney's Office.  I was there for five years, and
16   then I started off on my own, hung my own shingle,
17   and I've been doing it ever since.
18   Q    What law school did you graduate
19   from?
20   A    Brooklyn Law School.
21   Q    What year?
22   A    1998.
23   Q    Are you admitted in New York?
24   A    I'm sorry?
25   Q    Are you admitted in New York?
```

Andrew R. Bottari  7

```
1    A    Yes, I am.
2    Q    When were you admitted?
3    A    '99.
4    Q    Are you admitted anywhere else?
5    A    No.
6         MS. BRADY:  Please mark this as
7    Respondent's Exhibit A.
8         (Whereupon, a Notice of Claim was
9    received and marked as Respondent's
10   Exhibit A, for identification, as of this
11   date.)
12   Q    I'm going to show you what's been
13   previously marked as Respondent's Exhibit A and ask
14   if you recognize it?
15   A    Yes, I do.
16   Q    What is that document?
17   A    It's a Notice of Claim that was
18   submitted here at this address.
19   Q    Did you write that document or
20   compose it?
21   A    I signed this document.
22   Q    Did you read the document before
23   you signed it?
24   A    Of course.
25   Q    Your signature appears twice on
```

Andrew R. Bottari  8

```
1    that document?
2    A    Yes, it does.
3    Q    On that page which you have
4    there?(Indicating)
5    A    Individual verification.
6    Q    Do you know when you signed that;
7    what date?
8    A    May 5, 2006.
9    Q    Did you sign it in front of a
10   notary public?
11   A    Yes.
12        MS. BRADY:  Off the record.
13        (Whereupon, an off the record
14   discussion took place.)
15   Q    Have you testified with respect to
16   this claim prior to today?
17   A    Yes.
18   Q    Where was that?
19   A    It was in White Plains.  I don't
20   recall the address.
21        MR. D'AGOSTINO:  May I assist him?
22        MS. BRADY:  Sure.
23        MR. D'AGOSTINO:  It was yesterday,
24   at the office of Boeggeman, George.  They
25   represent the Village of Ardsley, and the
```

Andrew R. Bottari
9

```
1    attorney was Regina Valenski.
2         Q     Have you had any previous claims
3    against any municipality besides this one?
4         A     No.
5         Q     What is your claim against the
6    County of Westchester?
7              MR. D'AGOSTINO:  I'm just going to
8    object to that to the extent that it calls
9    for a legal conclusion.  Although Mr.
10   Bottari is an attorney, he is being
11   represented by me, but I'll direct him to
12   answer the question.
13             MS. BRADY:  Accepted.
14        A     False arrest, assault, battery,
15   unlawful imprisonment, intentional infliction of
16   emotional harm, deprivation of constitutional
17   rights, violation of civil rights, medical
18   expenses, psychological distress, prima facie tort,
19   and malicious prosecution, etc.
20        Q     Specifically with respect to the
21   County and in laymen's terms, not legal terms, why
22   had you filed a Notice of Claim against the County
23   of Westchester?
24        A     Malicious prosecution.
25        Q     Was it as the result of an arrest,
```

Andrew R. Bottari
10

```
1    as it started as an arrest at some point?
2         A     Correct.
3         Q     What was the date of that arrest?
4         A     March 3, 2005.  I'm referring to
5    the Notice of Claim.
6         Q     Where did that happen?
7         A     It happened in Ardsley, New York,
8    725 Saw Mill River Road.
9         Q     What time of day?
10        A     It was around midnight.
11        Q     Did it occur at a location, like
12   the name of a store, restaurant?
13        A     Yes.  It's a parking lot where
14   there's commercial stores and, specifically, my
15   vehicle was parked in front of CVS, a little bit
16   north, the north end of the store.
17        Q     Did the arrest occur in the parking
18   lot?
19        A     Yes.
20        Q     Can you describe for me what
21   happened?
22        A     I'm in the parking lot.  I'm with
23   my vehicle.  It's an SUV.  I just pulled into the
24   parking lot.  I'm parked there.  The back of the
25   vehicle is closest to the building, so I'm
```

Andrew R. Bottari
11

```
1    perpendicular to CVS.  I got out of my vehicle to
2    check something inside the back, and I shut the
3    trunk.  As I did this, a police officer drove by,
4    Police Officer Stevenson.  He drove past the
5    parking lot and then pulled in.  I was about to get
6    into my vehicle and in an accusatory tone he
7    basically said, what are you doing here?  I said,
8    nothing.  I'm just here.  I'm in my car, minding my
9    own business.  He said, well what's your name?  I
10   said, why do you need to know my name?  Where are
11   you coming from, he asked me and I said, I said
12   look, I'm just getting in my car and I'm going
13   home.  At that point, he pulled his vehicle in
14   front of my car and said no, you're not, you're not
15   leaving, and I said why, so I stood by the outside
16   of my car.  He called Sargent Fischer, who pulled
17   up.  They both got out of their cars.  It was cold
18   out and I had a three-quarter length jacket on, and
19   my hands were in my pockets and both of them, if
20   you could picture a "V", and I'm the head of the
21   "V".  Officer Stevenson is to the left and Sargent
22   Fischer is to the right.  Officer Stevenson said,
23   take your hands out of your pockets.  I said, for
24   what reason should I take my hands out of my
25   pockets and he said, for safety reasons.  Before I
```

Andrew R. Bottari
12

```
1    pull my hands out of my pockets I said, I just want
2    to let you know that I have my wallet in one hand
3    and I have my phone in the other.  I pulled them
4    out because I understand police officers don't know
5    who I am on the street, so I pulled my hands out
6    very slowly.  I put my hands in the air.  My hands
7    were raised about shoulder height, and at that
8    point both of them started to converge on me.  I
9    didn't know exactly what they were doing, but, at
10   that point, they grabbed me, spun me around and
11   threw me to the ground.  They were grabbing my
12   arms.  As I was going down, I said look, I'm a
13   former prosecutor.  I'm an attorney.  They just
14   kept on going.  My hands were getting twisted
15   behind my back, and I said, you can have them.  I'm
16   not resisting.  This is right in the middle of my
17   village.  I hit the ground, and I feel some blows
18   to the back of my head.  I don't know what it is,
19   if it's an elbow or fist, but there are blows to
20   the back of my head.  I lifted my head up and felt
21   something dripping down my face.  I looked at the
22   asphalt where my face is mushed together with the
23   asphalt, and I see blood and I'm like, I started to
24   get really angry.  My hands are handcuffed at this
25   point and I said, you guys really screwed up here.
```

Andrew R. Bottari    13

```
1    I used a stronger term than that.
2              MS. BRADY:  I'd like you to use the
3    actual words.
4         A    I said, you guys fucked up.  Now,
5    my face is bleeding, and I'm going to have to go to
6    the hospital.  They just left me on the ground.
7    They called EMS.  Both EMS drivers I know.
8    Mr. Clear was my biology teacher in high school.
9         Q    Clear, as in C-L-E-A-R?
10        A    I think so.  He's active in the
11   community.  He's a volunteer ambulance guy, and
12   he's active in the church, and Charles Strict,
13   who's a dentist, who has children my age.  Not my
14   age, but my children's age.  They play soccer, they
15   play softball, and he's very active in the
16   community, also.  I grew up in Ardsley, they know
17   me and I'm picked up, put in the back of the
18   ambulance and brought to Dobbs Ferry Hospital.
19        Q    In handcuffs?
20        A    In handcuffs, the whole time.
21        Q    At any time, did they tell you that
22   you were under arrest?
23        A    Yes, they did at some point.
24        Q    For what charge?
25        A    Yes, they did.
```

Andrew R. Bottari    14

```
1         Q    What was that?
2         A    Well, first, can I finish the part
3    about the hospital?
4              MS. BRADY:  Sure.
5         A    I received four stitches above my
6    left eye.
7              MS. BRADY:  As long as your
8    attorney doesn't mind that I'm going to go
9    back and clarify certain parts of the
10   narrative.
11             MR. D'AGOSTINO:  Go ahead.
12        A    So, after we left the hospital, I
13   was brought back to the Ardsley Village Police
14   Department where I was placed inside of a cell, and
15   at some point Officer Stevenson came out and said,
16   you're being charged with obstruction of government
17   administration, disorderly conduct, and resisting
18   arrest.  The other part of this is not going to
19   address the question and I'll stop in you want me
20   to.  This was placed in the local newspaper, "The
21   Enterprise", and I'm -- so I have people calling me
22   saying, what happened, you got arrested and so on
23   and so forth.  It's sort of a humiliation, living
24   in my community, having children and having my
25   children have to go to school and have parents know
```

Andrew R. Bottari    15

```
1    that I was arrested, but anyway, let's go forward
2    with this.
3         Q    Why were you at the parking lot of
4    CVS?
5         A    I just stopped.  I left my house
6    for a little while.  Went down to the village.  I
7    just -- no particular reason.
8         Q    You said you were checking your
9    car?
10        A    I wasn't checking for anything
11   specific.  It's my wife's car and it's a little
12   disarrayed.  I went to clean it, just to organize
13   it and I decided not to, and I went back in the car
14   and I was going to go home.
15        Q    When did you leave your house; what
16   time?
17        A    I think about 12:00.
18        Q    Is that midnight?
19        A    Yes, and it's about five minutes
20   from the village, literally, five minutes.
21        Q    When you left the house, did you
22   have a destination in mind?
23        A    Just go for a drive, and then I
24   just pulled into the village and parked.
25        Q    How long had you been in the
```

Andrew R. Bottari    16

```
1    parking lot when you were approached my Officer
2    Stevenson?
3         A    A couple of minutes, not even.  I
4    mean literally I got out of my car, I went to the
5    trunk.  I decided not to rearrange it and was
6    getting back into my car.
7         Q    Did you have your headlights on?
8         A    It was cold out.  I'm going to say
9    yes because it was cold out and more than likely I
10   had the heat on.  Then when the car was running,
11   the lights are automatically on.
12        Q    I think you said that you were
13   perpendicular to CVS with the back facing the
14   store?
15        A    Exactly.
16        Q    Is that the front of the strip
17   mall, or is it on the side, or behind it?
18        A    The front.  I'll describe it.  9A,
19   Saw Mill River Road runs north and south.  The
20   parking lot of CVS runs north and south as well,
21   and then the strip mall, it's not a strip mall, but
22   it's a commercial area, in front of it runs
23   parallel with both the parking lot and 9A.  So my
24   vehicle, the front of it was facing west.
25             THE WITNESS:  Do you get a picture
```

Andrew R. Bottari

1  of that?

2      MS. BRADY: Yes.

3      THE WITNESS: Okay, good.

4      Q    Did you know either of the

5  officers, either Officer Stevenson or Sargent

6  Fischer before that night?

7      A    No.

8      MR. D'AGOSTINO: When you say know,

9  do you mean did he ever see them around,

10  or did he ever know them personally?

11     Q    Did you know them personally?

12     A    No, but I've seen Officer Stevenson

13  around. I do 5K races in Ardsley and also my kids

14  are in little league and they have a march from

15  Concord Road School down to McDonald Park, and I'll

16  see Officer Stevenson -- you know -- directing

17  traffic.

18     Q    Can you describe Officer Stevenson

19  for me?

20     A    He's a white male, about 5'10",

21  5'11", short, dirty blonde hair, fair-skinned,

22  medium build. That's the extent. I don't know

23  what color his eyes are.

24     Q    That's fine. What about Sargent

25  Fischer?

---

18

Andrew R. Bottari

1      A    He's a white, thin male, black

2  hair, probably 6'2", fair-skinned and that is the

3  extent of my description of him. If I saw Sargent

4  Fischer, I would definitely know him.

5      Q    What is your date of birth?

6      A    7/26/66.

7      Q    What is your Social Security

8  number?

9      A    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.

10     Q    What is your height?

11     A    5'8".

12     Q    What is your weight?

13     A    190.

14     Q    Is that substantially the same as

15  it was back in March?

16     A    I was 195.

17     Q    What hospital did you say you were

18  taken to?

19     A    Dobbs Ferry Community Hospital.

20     Q    Approximately what time did you

21  arrive there?

22     A    Between 12:15 and 12:30, 12:35; I'm

23  not really sure.

24     Q    Did you have any conversations with

25  Mr. Clear or Mr. Strict during the ambulance ride?

---

19

Andrew R. Bottari

1      A    Yes, I did.

2      Q    What was the sum and substance of

3  that conversation? With whom did you have that

4  conversation?

5      A    I had it with Mr. Clear because he

6  was driving and Charles Strict was in the back. I

7  just said, I can't believe this happened. I can't

8  believe I'm in the Ardsley Village minding my

9  business, and I was in complete disbelief. So, my

10  conversation with them -- I don't recall -- the sum

11  and substance was my expression of my disbelief

12  that something like this happened to me.

13     Q    Was one or the other of the

14  officers in the ambulance with you?

15     A    I think Officer Stevenson. I'm

16  pretty sure. I'm not positive. I'm only thinking

17  one of them had to be there because they're not

18  going to let someone they don't know be in the

19  ambulance with the EMT. So, one of the officers

20  must have been there. I don't recall which one.

21     MR. D'AGOSTINO: Is there a

22  question pending, because I want to speak

23  to my client?

24     MS. BRADY: There is no question

25  pending.

---

20

Andrew R. Bottari

1      MR. D'AGOSTINO: May I speak with

2  him?

3      MS. BRADY: Sure.

4      MR. D'AGOSTINO: Off the record.

5      (Whereupon, an off the record

6  discussion took place.)

7      Q    Did Mr. Strict say anything to you

8  during the ride to the hospital?

9      A    He probably did, but I don't

10  remember what he said.

11     Q    When you arrived at the hospital,

12  were the officers there?

13     A    I don't know if they were there

14  when I arrived, but I do remember them in the

15  hospital, at least Officer Stevenson.

16     Q    At some point, were the handcuffs

17  removed from you while you were at the hospital?

18     A    I don't think so, I remember being

19  cuffed at all times.

20     Q    You indicated you were cuffed in

21  front of you?

22     A    I was cuffed behind me. I don't

23  remember exactly, but I do remember being cuffed

24  behind, but I don't know whether or not he took

25  them off and put them in the front. When I made

Andrew R. Bottari                                                      21

1   the indication, I just meant cuffed. Whether in
2   front or back, I don't remember.
3        Q        Did you see a doctor while you were
4   at the hospital?
5        A        Yes.
6        Q        Was it a man or a woman?
7        A        A man.
8        Q        Do you remember the doctor's name?
9        A        No.
10       Q        Did you make any physical
11  complaints to the doctor?
12       A        I don't remember.
13       Q        Do you remember if you had physical
14  complaints?
15       A        Definitely. I had pain through my
16  shoulder and leg, also to my head.
17       Q        Which shoulder?
18       A        You know what, I'd have to refer to
19  the Notice of Claim. I don't remember at this
20  point.
21       Q        Do you remember which leg?
22       A        I believe they're both the same
23  side.
24       Q        You indicated that there was a cut
25  on your head?

Andrew R. Bottari                                                      22

1        A        Yes, above my left eye.
2        Q        You received how many stitches?
3        A        Four.
4        Q        Did you receive any other treatment
5   at the hospital that night?
6        A        No.
7        Q        Did you see any doctors thereafter,
8   for any of the complaints that you had that day?
9        A        No.
10       Q        Then you indicated you were taken
11  back to the Ardsley Police Department?
12       A        Yes.
13       Q        Approximately what time did you
14  arrive there?
15       A        I don't remember, exactly.
16       Q        Approximately how long were you at
17  the hospital?
18       A        An hour, maybe. I'm not really
19  sure how long.
20       Q        After you were handcuffed at CVS,
21  did you make a phone call at any time thereafter;
22  were you able to make a phone call?
23       A        No.
24       Q        When you arrived at the police
25  department, were you allowed to make a phone call?

Andrew R. Bottari                                                      23

1        A        I didn't ask to make a phone call,
2   so I don't know whether or not I was.
3        Q        That was when Officer Stevenson or
4   Sargent Fischer told you what you were being
5   charged with?
6        A        Officer Stevenson.
7        Q        Where were you when he told you
8   that?
9        A        In the cell at the Ardsley Police
10  Station.
11       Q        Were you finger printed?
12       A        Yes, I was.
13       Q        Were you arraigned?
14       A        Not that day, I was arraigned.
15       Q        When were you arraigned?
16       A        I don't remember the arraignment
17  date.
18       Q        Were you released at some point
19  from the Ardsley Police Department?
20       A        Yes, I was.
21       Q        When was that?
22       A        Probably 4:00 or 5:00 in the
23  morning, the same day.
24       Q        On March 3rd? It was March 3rd at
25  midnight when the arrest happened or was it March

Andrew R. Bottari                                                      24

1   4th?
2        A        That's just it, I'm thinking it's
3   March 3rd.
4        Q        It was midnight?
5        A        Yes, because it was after midnight.
6   I'm going to say it's March 3rd.
7        Q        You were released --
8        A        On March 3rd.
9        Q        -- on March 3rd at about 4:00 or
10  5:00 in the morning?
11       A        Correct.
12       Q        Were you given a date to return?
13       A        On the tickets that were issued to
14  me, there was a return date.
15       Q        When was that return date?
16       A        I don't recall.
17       Q        Did you receive any other tickets
18  other than for obstruction of justice, disorderly
19  conduct, and resisting arrest?
20       A        No.
21       Q        Those were the three things you
22  were charged with?
23       A        That is correct.
24       Q        Did you appear in court on those
25  charges?

1    A    Yes, I did.

2    Q    Do you remember when that was?

3    A    2005, I don't remember the dates

4 that we went to court.

5    Q    Can you approximate how long it was

6 after the arrest?

7        MR. D'AGOSTINO:  If you'd like to

8 leave a space in the record, we'll provide

9 all the court dates.

10       MS. BRADY:  Okay, please leave a

11 space in the transcript.

12    A    ---------------------------------.

13    Q    Did you appear more than once in

14 court on these charges?

15    A    Yes.

16    Q    Approximately how many times?

17    A    Four or five times.

18    Q    Did you have a criminal attorney?

19    A    Yes, I did.

20    Q    Who was that?

21    A    Rocco D'Agostino.

22    Q    What is the nature of your legal

23 practice?

24    A    Criminal defense and real estate

25 transactions.  That's most of my work.

---

1    Q    What was the ultimate outcome of

2 those charges?

3    A    They were dismissed.

4    Q    Do you know when that was?

5        MR. D'AGOSTINO:  May I assist?

6       MS. BRADY:  Sure.

7       MR. D'AGOSTINO:  February 6, 2006.

8    Q    Do you know who the prosecutor was

9 that was handling this case?

10       MR. D'AGOSTINO:  Do you want me to

11 assist you?

12       MS. BRADY:  Sure.

13       MR. D'AGOSTINO:  It was the Office

14 of Jeanine Pirro.  The Assistant District

15 Attorney was Kieran Byrne.

16    Q    What was the basis of the

17 dismissal?

18       MR. D'AGOSTINO:  I'm going to

19 object only because it calls for a legal

20 conclusion, but if you'd like, I'll supply

21 with you a copy of the decision and order.

22       MS. BRADY:  I understand he's an

23 attorney and that he's not representing

24 himself, but he certainly would have a

25 laymen's understanding of why.  If he

---

1 doesn't know why, then that's fine.  I'll

2 take the copy of the dismissal.  He is in

3 criminal defense as well, so I think he

4 probably knows why.

5       MR. D'AGOSTINO:  What I'm trying to

6 explain to you is that it calls for a

7 legal conclusion and the best evidence of

8 that is the decision and order.  I will

9 make the objection now, and I'll do it

10 again in the future.  If Mr. Bottari wants

11 to answer the question, he is certainly

12 free to do so.

13    Q    Was it dismissed on the

14 prosecutor's motion or on your motion?

15       MR. D'AGOSTINO:  Defense motion of

16 speedy trial was the Court's articulation

17 of the grounds for the dismissal.  It was

18 a multi-faceted motion of dismissal on the

19 grounds that the Court basically decided

20 it on speedy trial and basically the

21 remainder of their motion was therefore

22 removed.

23       MS. BRADY:  There was a motion

24 made?

25       MR. D'AGOSTINO:  Yes.

---

1       MS. BRADY:  Based on that motion,

2 there was a dismissal?

3       MR. D'AGOSTINO:  Yes.

4    Q    Did you have any negotiations with

5 Mr. Byrne during the pendency of these charges?

6    A    I did not.

7    Q    Were you ever offered a plea

8 bargain?

9       MR. D'AGOSTINO:  When you say you,

10 you're referring to Mr. Bottari?

11       MS. BRADY:  Was Mr. Bottari

12 present?

13       MR. D'AGOSTINO:  In February, I'm

14 sure you know that.

15       MS. BRADY:  I know.

16       MR. D'AGOSTINO:  Prosecutors don't

17 speak to defendants.

18       MS. BRADY:  I don't know when there

19 is an attorney plea if there are different

20 concessions made.

21       MR. D'AGOSTINO:  Just so it's

22 clear, there were negotiations between

23 defendant, defendant's counsel, and the

24 prosecution.

25    Q    Was there any testimony taken

Andrew R. Bottari
29

```
 1   during the pendency of these charges during the
 2   course of the motions pending, or did any of the
 3   officers come in and speak to the Court in your
 4   presence?
 5        A    Yes.
 6        Q    Under what terms, was there
 7   testimony?
 8        A    Yes, Officer Stevenson testified at
 9   a suppression hearing.
10        Q    You were present when that
11   occurred?
12        A    Yes.
13        Q    What were you seeking to have
14   suppressed?
15        A    I believe his statement.
16        MR. D'AGOSTINO:  I'm only going to
17   object because the court record speaks for
18   itself, but if you want to grill him on
19   his memory.
20        MS. BRADY:  I'm just interested to
21   know his recollection of what happened.
22        MR. D'AGOSTINO:  Sure.
23        MS. BRADY:  I do not have the
24   documents.  Off the record.
25        (Whereupon, an off the record
```

Andrew R. Bottari
30

```
 1   discussion took place.)
 2        MR. D'AGOSTINO:  Just so the record
 3   is clear, I just don't want his future
 4   responses to be limited by his responses
 5   today.
 6        MS. BRADY:  I understand.
 7        MR. D'AGOSTINO:  Because the
 8   records speak with much more clarity than
 9   Mr. Bottari's recollection or even my own.
10        MS. BRADY:  Off the record.
11        (Whereupon, an off the record
12   discussion took place.)
13        Q    Are you making any claim with
14   regard to continuing physical injuries with respect
15   to what happened on March 3rd?
16        A    The only thing is the scar above my
17   left eye.  There is a permanent mark that will be
18   there for the remainder of my life.
19        Q    Do you have any pictures of your
20   condition after the arrest?
21        A    Yes, I do.
22        Q    Do you have them with you?
23        A    No.
24        Q    Were they marked at the hearing
25   yesterday?
```

Andrew R. Bottari
31

```
 1        A    No.
 2        MS. BRADY:  I'm going to request
 3   color photocopies of the pictures and just
 4   ask that you maintain the originals and/or
 5   digital means on which they were copied.
 6        MR. D'AGOSTINO:  Your demand is
 7   noted.  My objection is noted.  We'll take
 8   that under advisement.
 9        MS. BRADY:  Can I just ask what the
10   objection is?
11        MR. D'AGOSTINO:  He's not agreeing
12   to supply it at this point, but if you're
13   entitled to it, you'll get it.
14        Q    In the Notice of Claim, there's
15   also an indication of psychological injuries which
16   I believe you broached with respect to the
17   newspaper article.  Have you sought any medical
18   help with regard to any psychological injury?
19        A    No, I have not.
20        Q    Can you give me a specific list of
21   individuals who spoke to you about seeing it in the
22   newspaper?
23        A    There was a few different people
24   that spoke to me about it.  I know one off-hand,
25   Kevin Moriarity.  As far as other names, I don't
```

Andrew R. Bottari
32

```
 1   recall, but it was known in the community.
 2        MR. D'AGOSTINO:  If I may
 3   interject, we do have a list and would be
 4   more than happy to provide it to you on
 5   behalf of Mr. Bottari.  He can supply that
 6   to you.  Leave a space in the record.
 7   There's quite a few.
 8        MS. BRADY:  Leave spaces in the
 9   record.  Leave a number of spaces.
10        A    _____.
11        A    _____.
12        A    _____.
13        Q    Do you know what date the
14   information ran in the newspaper?
15        A    I have the newspaper.  I don't know
16   the date.
17        MS. BRADY:  We'll just ask for a
18   copy of the newspaper.
19        A    Getting back to your question about
20   psychological, you know I was born and raised in
21   Ardsley, and I'm slammed to the ground by police
22   officers in my village, not doing anything wrong on
23   my part, completely minding my own business, being
24   in a public place lawfully.  The psychological
25   impact now is that I'm living in this community
```

34

```
1   where my children go to school, and there are
2   parents that may or may not have my children play
3   with their children because they read the newspaper
4   and see, Andrew Bottari, 38-year-old man, arrested
5   for this at 3:15 or whatever time in the morning
6   that they said in the paper.  I can't really
7   describe exactly what the psychological term is,
8   but it's a humiliation in part, and more to it --
9   you know -- the impact on my own children.  A
10  parent may not want their children to play with my
11  children because of what happened with their
12  father, and also the fear of police officers at
13  this point.  I don't know what to expect.  I'm
14  always very courteous whenever I'm speaking to a
15  police officer still to this day and plus as a
16  prosecutor in Brooklyn, I'm always very sort of
17  understanding of police officers and what they're
18  going through.  If I ever get stopped by a police
19  officer, for whatever reason it is, I speak to them
20  like a gentlemen and even in Ardsley Village, I've
21  been stopped before, and they've asked me some
22  questions.  I say, my name is Andrew Bottari.  I
23  live up on the hill.  I'm not saying anything bad,
24  but I can't really figure out, articulate, the
25  exact psychological impact.
```

Andrew R. Bottari

34

```
1        Q     Just to clarify, with respect to
2   this incident that occurred, I believe you
3   testified that when the police officer asked you
4   your name, you questioned why he wanted it though,
5   right?
6        A     I don't know if I asked why he
7   wanted it.  I must have.  He said, what's your name
8   and I said, why?  I'm not doing anything wrong so,
9   yes.  The answer to your question is yes.
10       Q     Other than the time that you spent
11  at the Ardsley Police Station, did you spend any
12  other time in jail, any other time with regard to
13  these charges?
14       A     No.
15       Q     Did you, yourself, take any notes
16  with respect to what happened on March 3rd?
17       A     No.
18       Q     Other than the pictures that you
19  took of your injury, did you take any other
20  pictures with regard to the incident that happened
21  on March 3rd?
22       A     I went back to the parking lot
23  where the incident occurred, and I took pictures of
24  the blood that dripped out of my face onto the
25  asphalt.
```

Andrew R. Bottari

35

```
1        MS. BRADY:  I ask for copies of
2   those as well.
3        MR. D'AGOSTINO:  We will take it
4   under advisement.
5        Q     Do you have any specific claims
6   against Kieran Byrne?
7        A     No.
8        MS. BRADY:  I have no further
9   questions at this time.  Thank you.
10       (Time Noted is 3:30 p.m.)
11
12
13            ANDREW R. BOTTARI
14  Subscribed and sworn to
15  before me this _____
16  day of _____, 2006.
17  _____
18  NOTARY PUBLIC
19
20
21
22
23
24
25
```

Andrew R. Bottari

36

```
1        E X H I B I T S
2
3   RESPONDENT'S
4   EXHIBIT        DESCRIPTION          PG.
5
6   A              Notice of Claim       7
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

37

DOCUMENT AND INFORMATION REQUESTS:

| DESCRIPTION | PG./LN. |
|---|---|
| COLOR PHOTOCOPIES OF PICTURES | 31/2 |
| COPY OF NEWSPAPER | 32/17 |
| COPIES OF PICTURES | 35/1 |

---

38

C E R T I F I C A T E

I, Lisa Blute, a court reporter and Notary Public of the State of New York, do hereby certify:

That ANDREW R. BOTTARI, the witness whose examination is hereinbefore set forth, was duly sworn by me and that the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

_____
Lisa Blute

---

39

Correction Sheet

The following corrections, additions or deletions were noted on the transcript of the testimony which I gave in the above-captioned matter held on August 16, 2006.

PAGE_____LINE___SHOULD READ:_____

REASON FOR CHANGE:_____

PAGE_____LINE___SHOULD READ:_____

REASON FOR CHANGE:_____

PAGE_____LINE___SHOULD READ:_____

REASON FOR CHANGE:_____

PAGE_____LINE___SHOULD READ:_____

REASON FOR CHANGE:_____

PAGE_____LINE___SHOULD READ:_____

REASON FOR CHANGE:_____


Sworn to before me this

_____day of _____,2006.

_____

NOTARY PUBLIC

_____
ANDREW R. BOTTARI