Exhibit 5

ORIGINAL

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------X

DAVID FISHER and MICHAEL STEPHENSON,

PLAINTIFF(s),

-against-

Docket No: 07-cv-8192

ANDREW BOTTARI,

DEFENDANT(s).

-------------------------------X

EXAMINATION BEFORE TRIAL of the
Defendant, ANDREW BOTTARI, taken by the
Plaintiff, pursuant to a Court Order, held
at the offices of Hodges, Walsh & Slater,
L.L.P., 55 Church Street, Suite 211, White
Plains, New York 10601, before Marni
Galetta, a Notary Public of the State of
New York.

DATE: January 7, 2008

TIME: 12:06 P.M.

---

A P P E A R A N C E S:

MATTHEW FLAMM, ESQ.
    Attorneys for Plaintiff(s)
    26 Court Street, Suite 600
    Brooklyn, New York 11242
    BY: MATTHEW FLAMM, ESQ.

HODGES, WALSH & SLATER, L.L.P.
    Attorneys for Defendant(s)
    DAVID FISHER and Defendant(s)
    POLICE DEPARTMENT OF THE VILLAGE OF ARDSLEY
    55 Church Street, Suite 211
    White Plains, New York 10601
    BY: JOHN J. WALSH, ESQ.
    File #: 051111

---

221. UNIFORM RULES FOR THE
CONDUCT OF DEPOSITIONS

221.1 Objections at depositions.
(a) Objections in general. No objections
shall be made at a deposition except those
which, pursuant to subdivision (b), (c) or
(d) of this rule, would be waived if not
interposed, and except in compliance with
subdivision (e) of this rule. All
objections made at a deposition shall be
noted by the officer before whom the
deposition is taken, and the answer shall
be given and the deposition shall proceed
subject to the objections and to the right
of a person to apply for appropriate relief
pursuant to article 31 of the CPLR.
(b) Speaking objections restricted. Every
objection raised during a deposition shall
be stated succinctly and framed so as not
to suggest an answer to the deponent, and
at the request of the questioning attorney,
shall include a clear statement as to any
defect in form or other basis of error or
irregularity. Except to the extent
permitted by CPLR Rule 3115 or by this
rule, during the course of the examination
persons in attendance shall not make
statements or comments that interfere with
the questioning.

221.2 Refusal to answer when objection is
made. A deponent shall answer all
questions at a deposition, except (i) to
preserve a privilege or right of
confidentiality, (ii) to enforce a
limitation set forth in an order of a
court, or (iii) when the question is
plainly improper and would, if answered,
cause significant prejudice to any person.
An attorney shall not direct a deponent not
to answer except as provided in CPLR Rule
3115 or this subdivision. Any refusal to
answer or direction not to answer shall be
accompanied by a succinct and clear
statement of the basis therefor. If the
deponent does not answer a question, the
examining party shall have the right to
complete the remainder of the deposition.

---

221. UNIFORM RULES FOR THE
CONDUCT OF DEPOSITIONS

221.3 Communications with the deponent.
An attorney shall not interrupt the
deposition for the purpose of communicating
with the deponent unless all parties
consent or the communication is made for
the purpose of determining whether the
question should not be answered on the
grounds set forth in section 221.2 of these
rules and, in such event, the reason for
the communication shall be stated for the
record succinctly and clearly.

IT IS FURTHER STIPULATED AND AGREED
that all rights provided to all parties by
the CPLR and, also, any and all objections
as to form, are reserved to the time of
trial.

IT IS FURTHER STIPULATED AND AGREED
that the within examination may be signed
before any Notary Public with the same
force and effect as if signed before a
Judge of the court.

IT IS FURTHER STIPULATED AND AGREED
that the examination may be utilized for
all purposes as provided by the CPLR.

---

**Page 5**

BOTTARI

```
 1   A N D R E W   B O T T A R I, called as a
 2   witness, having been first duly sworn, by a
 3   Notary Public of the State of New York, was
 4   examined and testified as follows:
 5   EXAMINATION BY
 6   MR. WALSH:
 7        Q.   Please state your name for the
 8   record.
 9        A.   Andrew Bottari.
10        Q.   Where do you reside?
11        A.   10 Springwood Avenue, Ardsley,
12   New York 10502.
13        Q.   Mr. Bottari, you are an
14   attorney, correct?
15        A.   Yes.
16        Q.   I think you know the drill. I
17   am going to be asking you some questions.
18   If you don't understand any of questions,
19   please let me know and I will attempt to
20   rephrase them so you do.
21        A.   Yes.
22        Q.   Do you understand that?
23        A.   Yes.
24        Q.   How long have you resided at 10
25   Springwood Avenue in Ardsley?
```

---

**Page 6**

BOTTARI

```
 1        A.   About seven years.
 2        Q.   With whom do you presently
 3   reside?
 4        A.   My wife and two children.
 5        Q.   Your wife's name?
 6        A.   Michelle.
 7        Q.   Does she use your last name?
 8        A.   She does.
 9        Q.   Your children's names and ages?
10        A.   Olivia, nine-years-old and
11   Paul, eight-years-old.
12        Q.   Where did you reside before you
13   moved to 10 Springwood Avenue in Ardsley?
14        A.   1551 Fox Glen Road.
15        Q.   Was that also in Ardsley?
16        A.   Hartsdale.
17        Q.   Did you reside there with your
18   wife as well?
19        A.   Yes.
20        Q.   How long have you been married?
21        A.   We were married in 1996.
22        Q.   Are you presently employed,
23   Mr. Bottari?
24        A.   Yes.
25        Q.   In what role, what capacity?
```

---

**Page 7**

BOTTARI

```
 1        A.   Am an attorney.
 2        Q.   Do you have your own firm?
 3        A.   I do.
 4        Q.   The name of that firm?
 5        A.   Bottari & Associates.
 6        Q.   Are there, in fact, associates?
 7        A.   No, not at the moment.
 8        Q.   Where is your office?
 9        A.   445 Hampton Avenue, Suite 405.
10        Q.   Here in White Plains?
11        A.   Yes.
12        Q.   How long have you been on
13   Hampton Avenue?
14        A.   Approximately four years.
15        Q.   What type of law do you
16   practice?
17        A.   Criminal defense.
18        Q.   How long have you been on your
19   own?
20        A.   Four years.
21        Q.   Were you working with a firm
22   prior to going out on your own?
23        A.   No.
24        Q.   Who were you working with?
25
```

---

**Page 8**

BOTTARI

```
 1        A.   Kings County District
 2   Attorney's office.
 3        Q.   How long were you with the
 4   Brooklyn D.A.'s?
 5        A.   Five years.
 6        Q.   Where did you attend high
 7   school?
 8        A.   Ardsley.
 9        Q.   You went to college?
10        A.   Yes.
11        Q.   When did you graduate?
12        A.   1984.
13        Q.   What college?
14        A.   I graduated from Vassar
15   College.
16        Q.   When was that?
17        A.   1995.
18        Q.   Where did you go to law school?
19        A.   Brooklyn.
20        Q.   When did you graduate from law
21   school?
22        A.   '98.
23        Q.   Did you go directly into the
```

BOTTARI

```
 1   Kings County District Attorney's office?
 2        A.   Yes.
 3        Q.   What was the highest rank you
 4   achieved at the Brooklyn DA's office?
 5        A.   There was no ranking, but I
 6   became a felony assistant district
 7   attorney.
 8        Q.   What were the circumstances
 9   surrounding your leaving the Kings County
10   District Attorney's office?
11        A.   I was ready to leave.
12        Q.   Did you have an immediate
13   supervisor there?
14        A.   Yes.
15        Q.   Who was your last immediate
16   supervisor at the DA's office?
17        A.   I don't recall. I could name a
18   few of my supervisors though, but not my
19   last one.
20        Q.   Give me one or two.
21        A.   Paul Burn, Shundia (phonetic)
22   Simpson.
23        Q.   Can you spell Burn?
24        A.   B-U-R-N.
```

BOTTARI

```
 1        Q.   And Shundia?
 2        A.   I don't know how to spell
 3   Shundia, but I can spell her last name,
 4   Simpson.
 5        Q.   Are they still with the DA's
 6   office, do you know?
 7        A.   I think Paul is, but Shundia is
 8   a judge now in New York County.
 9        Q.   Could I have your date of birth
10   please?
11        A.   7-26-66.
12        Q.   Your Social Security number?
13        A.   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.
14        Q.   Have you ever been married
15   before prior to your marriage to your wife
16   Michele?
17        A.   No.
18        Q.   Were you ever arrested on any
19   occasion prior to the March 3, 2005
20   incident with the Ardsley Police?
21        A.   Yes.
22        Q.   On how many occasions?
23        A.   Once.
24        Q.   Where was that?
```

BOTTARI

```
 1        A.   Poughkeepsie, New York.
 2        Q.   Poughkeepsie?
 3        A.   Was it within the city of
 4   Poughkeepsie?
 5        A.   I don't know.
 6        Q.   You don't know?
 7        A.   It might be the town of
 8   Poughkeepsie. I am not sure.
 9        Q.   What police department was
10   involved?
11        A.   Poughkeepsie.
12        Q.   You don't know if it was the
13   town or city?
14        A.   No.
15        Q.   What was the charge?
16        A.   Driving while intoxicated.
17        Q.   When was that?
18        A.   1993.
19        Q.   Is that when you were in
20   college?
21        A.   Yes.
22        Q.   What was the outcome of that?
23        A.   I got an infraction, driving
24   while ability impaired.
25        Q.   Do you remember any of the
```

BOTTARI

```
 1   police officers involved in that?
 2        A.   No.
 3        Q.   Was there a District Attorney
 4   involved in that?
 5        A.   Yes.
 6        Q.   Who was your attorney?
 7        A.   I don't remember his name.
 8        Q.   Were you actually taken to the
 9   police station as a result of that arrest?
10        A.   Yes.
11        Q.   Were you handcuffed?
12        A.   I don't remember.
13        Q.   How long did you remain at the
14   police station following the arrest in
15   1993?
16        A.   I don't remember.
17        Q.   Were you placed in a cell?
18        A.   I don't remember that either.
19        Q.   As a result of the infraction,
20   I assume you paid a fine of some kind?
21        A.   Yes.
22        Q.   No jail time?
23        A.   No.
24        Q.   Approximately what time of day
```

BOTTARI

1  did the incident on March 3, 2005 take
2  place?
3        A.  Yes.
4        Q.  Repeat the question please.
5        A.  Approximately what time did the
6  incident involving the Ardsley police take
7  place?
8        A.  I would say midnight.
9        Q.  Was it --
10       A.  Midnight to 12:15.
11       Q.  So it was the early morning
12  hours of March 3rd?
13       A.  Yes.
14       Q.  Do you recall what day of the
15  week that was, March 3rd?
16       A.  I believe it was Thursday.
17       Q.  Had you worked the previous
18  day, the Wednesday?
19       A.  I don't recall.
20       Q.  Where did the incident with the
21  Ardsley police take place?
22       A.  In Ardsley Village.
23       Q.  Whereabouts?
24       A.  In a parking lot.
25       Q.  Is that a parking lot for a

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com
13

---

BOTTARI

1  small shopping center?
2        A.  Yes.
3        Q.  How many stores in that
4  shopping center?
5        A.  Approximately six.
6        Q.  Is there a main anchor store in
7  that shopping center?
8        A.  CVS.
9        Q.  What time had you arrived in
10  that parking lot that evening?
11       A.  Around 12.
12       Q.  How long were you in the
13  parking lot before you realized that a
14  police officer was present?
15       A.  Present in the parking lot?
16       Q.  The first time you realized
17  there was a police officer coming to speak
18  to you.
19       A.  Couple of minutes.
20       Q.  Where had you been prior to
21  going to that parking lot?
22       A.  Immediately prior?
23       Q.  Yes.
24       A.  I was at my house.
25       Q.  Were any stores open when you

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com
14

---

BOTTARI

1        Q.  What had you been doing at your
2  house prior to leaving and going to the CVS
3  parking lot?
4        A.  Watching TV.
5        Q.  Were you watching TV with
6  anybody?
7        A.  I don't recall.
8        Q.  Was your wife home before you
9  left to go to the CVS parking lot?
10       A.  Yes.
11       Q.  Your children home?
12       A.  Yes.
13       Q.  What was your purpose for going
14  to the CVS parking lot?
15       A.  No purpose.
16       Q.  What time did you leave your
17  house?
18       A.  Approximately 12.
19       Q.  You drove directly to the
20  parking lot?
21       A.  Drove down to the village and
22  then I decided to park in the parking lot.
23       Q.  Did you drive through the
24  village?
25

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com
15

---

BOTTARI

1        A.  I don't remember.
2        Q.  Did you see anybody that you
3  knew between the time you left your house
4  and the time you first spoke to a police
5  officer that night?
6        A.  No.
7        Q.  Had you had any arguments with
8  your wife that evening?
9        A.  No.
10       Q.  Did you have a cell phone with
11  you at the time you went to the parking
12  lot?
13       A.  Yes.
14       Q.  Had you received any phone
15  calls that evening before you left to go to
16  the parking lot?
17       A.  Not that I recall.
18       Q.  Had you ever gone to this
19  parking lot before?
20       A.  At night?
21       Q.  Yes.
22       A.  Yes.
23       Q.  Were any stores open when you
24  arrived?
25

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com
16

BOTTAI

```
 1   Q.   No.
 2   Q.   How far is it from your house?
 3   A.   Miles-wise or time-wise?
 4   Q.   Let's start with miles.
 5   A.   Approximately one mile.
 6   Q.   What road is the parking lot
 7   on?
 8   A.   Saw Mill River Road.
 9   Q.   So if you were to drive
10   directly from your house to the parking
11   lot, what route would you take?
12   A.   Springbrook to Riverview to
13   Euclid to Ashford, Legion Drive, Center
14   Street, Ashford Avenue, but there might be
15   another route too. There are two different
16   routes I would take.
17   Q.   There are other routes as well?
18   A.   Yes.
```

17

BOTTAI

```
 1   Q.   How long would each route take
 2   in time?
 3   A.   Both two to three minutes. At
 4   that time, two to three minutes depending
 5   on traffic. It might take longer.
 6   Q.   Not much traffic at midnight?
 7   A.   Not that night, no.
 8   Q.   Do you remember what the
 9   weather was like that evening?
10   A.   Cool.
11   Q.   What were you wearing?
12   A.   I was wearing slacks, a shirt
13   and a three-quarter length jacket.
14   Q.   What type of jacket; a ski
15   jacket?
16   A.   No.
17   Q.   Wool jacket?
18   A.   No. It is a business jacket.
19   It is a dress -- in between a dress and a
20   casual jacket.
21   Q.   Do you still have it?
22   A.   I do.
23        MR. WALSH: I ask that you
24   retain it until such time this matter
25   is concluded.
```

18

BOTTAI

```
 1        THE WITNESS: Yes.
 2        MR. FRANK: Let me answer.
 3        So noted.
 4   Q.   What were you doing in the
 5   parking lot from the time you first arrived
 6   until the time a police officer came to the
 7   parking lot?
 8   A.   I was in my car sitting in the
 9   driver's side.
10   Q.   Were you just sitting there or
11   were you doing anything else besides
12   sitting?
13   A.   I was listening to music.
14   Q.   Do you remember what you were
15   listening too?
16   A.   Not the kind of music, no.
17   Q.   Why did you go to the parking
18   lot to listen to music that night?
19   A.   The car has a very good system
20   in it and I can't rightly play the stereo
21   system in my neighborhood because of my
22   neighbors and I parked in the parking lot
23   to listen to music because there is no
```

19

BOTTAI

```
 1   neighbors around.
 2   Q.   On the day of this incident,
 3   did you have a stereo at home?
 4   A.   Yes.
 5   Q.   Is there a reason why you
 6   couldn't play music at your own home?
 7   A.   Well, I could have.
 8   Q.   Had you gone to this parking
 9   lot and listened to music on occasions
10   prior to March 3, 2005?
11   A.   Yes.
12   Q.   How many times?
13   A.   I don't recall.
14   Q.   More than once?
15   A.   Probably.
16   Q.   More than five times?
17   A.   I don't remember how many times
18   really. I have been living in the
19   neighborhood practically my entire life.
20   So, if you went back to when I am a child,
21   16-years-old, I don't know how many times.
22   Q.   You had done this prior to
23   going to college as well, listening to
24   music in this parking lot?
```

20

BOTTARI

2    And met people, sure.
3    Q.  Had you consumed any illegal
4  drugs that evening at all before the police
5  arrived?
6    A.  No.
7    Q.  Had you consumed any alcohol
8  that evening?
9    A.  No.
10    Q.  Were you on any medication at
11  the time?
12    A.  No.
13    Q.  Had you failed to take
14  medication that had been prescribed for you
15  that you should have taken?
16    A.  No.
17    Q.  What position was your vehicle
18  parked in relation to the CVS store?
19    A.  It was perpendicular to CVS and
20  it was backed in.
21    Q.  Is there a sidewalk in front of
22  that CVS store?
23    A.  Yes.
24    Q.  How close was the rear of your
25  car to that sidewalk at the time the police

---

BOTTARI

2  arrived?
3    A.  I don't remember exactly. It
4  was in a parking spot though?
5    Q.  You were in a marked parking
6  space?
7    A.  Yes.
8    Q.  Is there a lane for traffic to
9  pass between the CVS and the marked parking
10  space you were parked in or is the parking
11  directly up against the sidewalk?
12    A.  The parking -- my vehicle is
13  next to the sidewalk. The sidewalk is next
14  to the buildings, CVS
15    Q.  Was your vehicle within one
16  foot of the sidewalk?
17    A.  It was right next to the
18  sidewalk. I don't know exactly how far it
19  was from the sidewalk.
20    Q.  Is there an entranceway to CVS
21  off that sidewalk?
22    A.  Yes.
23    Q.  How far was your car away from
24  the entranceway to CVS?
25    A.  I don't remember.

---

BOTTARI

2    Q.  How did you first become aware
3  of a police officer being at that parking
4  lot?
5    A.  I noticed him drive by.
6  He passed the shopping center?
7    A.  Yes.
8    Q.  Did you see him come back?
9    A.  Yes.
10    Q.  Did you see his vehicle turn
11  into the shopping center?
12    A.  Yes.
13    Q.  How long after he drove by did
14  he return?
15    A.  I'll say approximately one
16  minute, maybe less.
17    Q.  At the time you saw the police
18  officer pull into the shopping center
19  parking lot, were there any doors open in
20  your vehicle?
21    A.  I don't remember.
22    Q.  Were you sitting in your
23  vehicle when the police officer returned to
24  the parking lot?
25    A.  I think I was walking to the

---

BOTTARI

2  front of my vehicle, to the front door, the
3  front driver's side door.
4    Q.  Where had you been immediately
5  before you started walking to the driver's
6  side door?
7    A.  The rear of my vehicle.
8    Q.  What were you doing at the rear
9  of your vehicle prior to walking to the
10  front door?
11    A.  I was going to tidy up the back
12  of the car.
13    Q.  What type of car was it?
14    A.  An SUV.
15    Q.  What make and model?
16    A.  GMC Denali.
17    Q.  Do you remember what year?
18    A.  2004.
19    Q.  What type of stereo system did
20  it have?
21    A.  A Bose.
22    Q.  So to tidy up the back of the
23  car, was it necessary for you to open up
24  the hatchback in the back of the car?
25    A.  No.

use

                                    BOTTARI                          25

```
1    time?
2         A.   Was the hatchback open at the
3    center?
4         Q.   No.
5         A.   How long were you out of the
6    vehicle before the hatchback open when the
7    police officer first drove by the shopping
8         A.   I don't remember, but at some
9    police it was open.
10        Q.   At some point, did you then
11   close the hatchback?
12        A.   Yes.
13        Q.   How long before you saw the
14   police officer pull in the parking lot did
15   you close that hatchback?
16        MR. FLAMM:   Objection.
17        You can answer.
18        A.   I don't remember.
19        Q.   Was is it open when the police
20   officer pulled in?
21        A.   I don't think so.  I am not
22   really sure because by the time he got -- I
23   was by the front door of my car and then he
24   pulled up.
25        Q.   Did you actually tidy up the
```

                                    BOTTARI                          26

```
1    rear of the vehicle at all?
2         A.   No.
3         Q.   How long were you out of the
4    vehicle before he pulled into the parking
5    lot, the police officer?
6         A.   Maybe 30 seconds, a minute.
7    very brief period of time.
8         Q.   Did you get out of the vehicle
9    before or after you saw the police officer
10   first drive by?
11        A.   I don't remember.
12        Q.   Was the hatchback open or
13   closed when the police officer first drove
14   by?
15        MR. FLAMM:   I think it was
16   asked and answered.
17        You may answer it again.
18        MR. WALSH:   Thank you.
19        A.   I don't remember.
20        Q.   Was the police officer in a
21   police cruiser, in a marked vehicle?
22        A.   In a marked vehicle, yes.
23        Q.   Was he wearing a uniform?
24        A.   Yes.
25        A.   It was not behind my vehicle.
```

```
1         Q.   Do you know the name of the
2    first officer that arrived at the scene?
3         A.   Police Officer Stephenson.
4         Q.   Did you have a conversation
5    with Police Officer Stephenson when he
6    first arrived at the scene?
7         MR. FLAMM:   Note my objection.
8         You can answer.
9         A.   It was a conversation.
10        Q.   The first conversation you had
11   with Police Officer Stephenson, was he in
12   his vehicle or outside of his vehicle?
13        A.   He was inside his vehicle.
14        Q.   When you first had a
15   conversation with Officer Stephenson, were
16   you inside your vehicle or outside your
17   vehicle?
18        A.   I wouldn't characterize it as a
19   conversation.
20        Q.   All right.
21        A.   When the first words were
22   spoken by either you or Officer Stephenson
23   in the park lot that evening, were you
24   inside your vehicle or outside of your
```

                                                                     27

                                    BOTTARI                          28

```
1    vehicle?
2         A.   I was outside of my vehicle.
3         Q.   Who spoke first; you or Officer
4    Stephenson?
5         A.   Officer Stephenson.
6         Q.   What were the first words he
7    said to your?
8         A.   He asked what I was doing
9    there.
10        Q.   What did he say; then?
11        A.   He said, "What are you doing
12   here?"  I responded, "I am not doing
13   anything.  I am just here."  Then he asked
14   again and I said, "I am listening to music.
15   "
16        Q.   What did you say?
17        A.   I said, "I am not doing
18   anything."
19        Q.   Did you respond?
20        A.   Yes.
21        Q.   When he pulled in, did his
22   vehicle come behind your vehicle or one
23   side or the other?
24        A.   It was not behind my vehicle.
```

BOTTARI

1   Q.   Okay.  Was there anything between you
2   and his vehicle when the two of you first
3   spoke?
4        A.   Yes.
5        Q.   What do you mean?
6        A.   Well, was his car on the other
7   side of your vehicle or on the same side
8   you were on?
9        Q.   His vehicle was on the same
10  side as I was on.
11       A.   Which was the driver's side?
12       Q.   Correct.
13       A.   How far from your vehicle was
14  his vehicle stopped when the two of you
15  first spoke?
16       A.   Maybe four steps, five steps.
17       Q.   Did there come a time when
18  Officer Stephenson got out of his vehicle?
19       A.   Yes, he did get out of his
20  vehicle.
21       Q.   How long after the first
22  conversation did he get out of his vehicle?
23       A.   I don't remember how long.
24       Q.   Did you see him use his radio

29

BOTTARI

1   at all prior to him getting out of his
2   vehicle?
3        A.   Yes.
4        Q.   Did you overhear what he said
5   when he used his radio?
6        A.   No.
7        Q.   Did you get back in your
8   vehicle before Officer Stephenson got out
9   of his?
10       A.   No.
11       Q.   Did you at any time get back in
12  your vehicle that evening before being
13  taken away?
14       A.   No.
15       Q.   Was there any further
16  conversation between you and Officer
17  Stephenson while he was still in his
18  vehicle after you told him you were
19  listening to music?
20       A.   Yes.
21       Q.   What else was said while he was
22  still in his vehicle?
23       A.   I said, "I am going to go home.
24  I am going to leave."

30

BOTTARI

1   Q.   And did he respond?
2        A.   Yes.
3        Q.   What did he say?
4        A.   He said, "no, you are not."
5        Q.   Was there any further
6   conversation before he got out of his
7   vehicle?
8        A.   Yes.
9        Q.   What else was said before he
10  got out of his vehicle?
11       A.   I said, "what are you doing?"
12       Q.   Did he respond?
13       A.   No.  He just pulled his car up
14  in front of my car blocking my vehicle in.
15       Q.   Did he put his car in reverse
16  to do that?
17       A.   I don't think so.  He pulled it
18  forward.
19       Q.   How would you characterize the
20  tone of voice Officer Stephenson used
21  during the conversation you had with him
22  while he was still in his car?
23       A.   Interrogative.
24       Q.   How about the tone of voice

31

BOTTARI

1   that you used; what type of tone of voice
2   did you use in response to his question?
3        A.   Yes.
4        Q.   Monotone, the way I am speaking
5   to you now.
6        A.   After he pulled his vehicle in
7   behind yours, did Officer Stephenson get
8   out of his vehicle?
9        A.   He did.
10       Q.   Did there come a time when
11  another police officer arrived?
12       A.   Yes.
13       Q.   About how long after Officer
14  Stephenson got there did the second officer
15  arrive?
16       A.   Approximately one to two
17  minutes.
18       Q.   Had Officer Stephenson moved
19  his vehicle to block yours in prior to the
20  arrival of the other officer?
21       A.   Yes.
22       Q.   Do you know the name of the
23  other officer?
24       A.   Yes.
25       Q.   What is his name?

32

**33**

BOTTANI

```
 1
 2        A.   Sergeant Fletcher.
 3        Q.   Had Officer Stephenson gotten
 4   out of his vehicle before the arrival of
 5   Sergeant Fletcher?
 6        A.   Yes.
 7        Q.   Where were you in relation to
 8   your driver's side door when Sergeant
 9   Fletcher arrived?
10        A.   I was -- I don't remember
11   exactly.
12        Q.   Were you still within five feet
13   of your vehicle?
14        A.   Yes.
15        Q.   When Stephenson first arrived,
16   was your driver's side door open?
17        A.   I don't remember.
18        Q.   How about when Fletcher first
19   arrived, was your driver's side door open?
20        A.   I don't recall.
21        Q.   At any time that evening, did
22   you reopen the driver's door?
23        A.   I did.
24        Q.   Do you recall whether that was
25   before or after either of the police
```

**34**

BOTTANI

```
 1   officers arrived?
 2        A.   It was when I said, "I am going
 3   to get back in my car and leave." I went
 4   to open my door and he pulled up in front
 5   of my door. I don't recall if I shut the
 6   door or not after that.
 7        Q.   So it was after you opened your
 8   door that Officer Stephenson moved his
 9   vehicle behind yours?
10        A.   Say that again.
11        Q.   What is the sequence of events
12   regarding you opening the door and him
13   moving his vehicle? Did you open the door
14   before he moved his vehicle or at the same
15   time or after he moved his vehicle?
16        A.   I said that I was going home
17   or, "I am leaving" and I went to open --
18   and he said, "no, you are not" and
19   somewhere in there, I opened the door and
20   then he pulled his car in front of my
21   vehicle.
22        Q.   Was there any conversation
23   between you and Officer Stephenson after he
24   got out of his vehicle and before Sergeant
25
```

**35**

BOTTANI

```
 1   Fletcher arrived?
 2        A.   I don't remember.
 3        Q.   Where in relation to your
 4   vehicle did Officer Fletcher pull his
 5   vehicle to a stop?
 6        A.   His vehicle was north and west
 7   of my vehicle.
 8        Q.   If you were sitting in your
 9   driver's side behind the steering wheel,
10   would his vehicle have been to the left, to
11   the right, straight ahead?
12        A.   To the right.
13        Q.   Do the right.
14        A.   And how far away from your
15   vehicle?
16        A.   Maybe 10 steps.
17        Q.   Where were you when Officer
18   Fletcher first arrived, Sergeant Fletcher?
19        A.   Next to my vehicle.
20        Q.   Still near the driver's side
21   door?
22        A.   Same area, yeah.
23        Q.   Where was Officer Stephenson
24   when Sergeant Fletcher first arrived?
25        A.   Near his vehicle.
```

**36**

BOTTANI

```
 1        Q.   Did you have a conversation
 2   with Sergeant Fletcher that evening?
 3        A.   No.
 4        Q.   No conversation at all with
 5   the Sergeant?
 6        A.   No.
 7             MR. FLAMM:  Note my objection
 8        to the use of the word conversation.
 9        Q.   Did Sergeant Fletcher ask you
10   any questions at the scene that night?
11        A.   No.
12        Q.   Did you say anything directly
13   to Sergeant Fletcher that evening?
14        A.   No.
15        Q.   After Sergeant Fletcher first
16   arrived, what happened next?
17        A.   I observed Officer Stephenson
18   and Sergeant Fletcher come close to each
19   other.
20        Q.   Did they appear as though they
21   were conversing?
22        A.   Yes.
23        Q.   Did you overhear anything that
24   was being said between the two of them
25
```

BOTTARI

```
 1  immediately after Sergeant Fletcher arrived?
 2      A.   No.
 3      Q.   For how long did they speak?
 4      A.   Briefly.
 5      Q.   After they stopped their
 6  conversation between each other, what
 7  happened?
 8      A.   They formed -- they separated.
 9      Q.   Where did they go in relation
10  to where you were standing?
11      A.   They formed -- this is how I
12  could describe it.  They sort of formed a v
13  or a triangle.
14      Q.   With you at the apex of the v?
15      A.   What's that?
16      Q.   With you at the point of the v?
17      A.   Yes.
18      Q.   So one was somewhat to your
19  left and one was somewhat to your right?
20      A.   Correct.
21      Q.   Which one was to your left?
22      A.   To my left was Officer
23  Stephenson.
24      Q.   Sergeant Fletcher then would
```

BOTTARI

```
 1  have been somewhat to your right?
 2      A.   Yes.
 3      Q.   How close were you to the front
 4  of your car at that point?
 5      A.   I was in the same area that I
 6  was all along.
 7      Q.   You were still back by the
 8  driver's door?
 9      A.   Yes.
10      Q.   Which way were you facing in
11  relation to your car; towards your car,
12  away from your car, towards the front of
13  the car, towards the back?
14      A.   I was facing towards Mill
15  River Road.
16      Q.   Which way is that in relation
17  to the way your vehicle was parked?
18      A.   The nose of my vehicle was
19  pointed towards Saw Mill River Road.  I was
20  also pointed towards Saw Mill River Road.
21      Q.   So your vehicle was immediately
22  to your right?
23      A.   Correct.
24      Q.   You were still at about the
```

BOTTARI

```
 1  driver's door?
 2      A.   Yes.
 3      Q.   If you reached out, would you
 4  have been able to touch the driver's door
 5  when they formed this v?
 6      A.   I don't recall.
 7      Q.   Was any portion of your vehicle
 8  between you and Sergeant Fletcher when they
 9  formed this v?
10      A.   No.
11      Q.   Off the record.
12           (Whereupon, an off-the-record
13  discussion was held.)
14      A.   He had a direct line to me and
15  so did Officer Stephenson.
16      Q.   How tall are you?
17      A.   Five-eight.
18      Q.   What was your weight at the
19  time?
20      A.   It was 155.
21      Q.   In relation to you, how big was
22  Sergeant Fletcher?
23      A.   Sergeant Fletcher is over six
24  feet.
25      Q.   How about Officer Stephenson,
```

39

BOTTARI

```
 1  how big is he?
 2      A.   Under six feet, maybe
 3  five-eleven.
 4      Q.   Are they stood one to your left
 5  and one to your right, did either one of
 6  them say anything to you?
 7      A.   Yes.
 8      Q.   Which one spoke?
 9      A.   Officer Stephenson.
10      Q.   What did Officer Stephenson
11  say?
12      A.   He said, "get your hands out of
13  your pockets."
14      Q.   What did you say?
15      A.   I asked him why.
16      Q.   What did he say?
17      A.   He responded, "for safety
18  reasons."
19      Q.   Did you then take your hands
20  out of your pockets?
21      A.   Not immediately.
22      Q.   Did you say anything else to
23  Officer Stephenson after he said, "for
24  safety reasons"?
```

40

BOTTARI

```
 1       A.   Yes.
 2       Q.   What did you say?
 3       A.   I said, "I have my phone in one
 4   pocket and my wallet in the other."
 5       Q.   Why did you tell him that?
 6       A.   Because I wanted them to know I
 7   had something I wanted them to pull out of my
 8   pockets.
 9       Q.   Did you have anything else in
10   your pockets besides your phone and your
11   wallet?
12       A.   No.
13       Q.   Did they ask you to take
14   anything out of your pockets?
15       A.   No.
16       Q.   Why were you going to take
17   these things out of your pockets?
18       A.   I just did.  I just said that.
19   I was pulling my hands out of my pockets
20   and I had stuff in it and I wanted them to
21   know this is what I had.
22       Q.   Did you have a business card
23   case at the time?
24       A.   I don't recall.  But I can tell
```

BOTTARI

```
 1   you this, I don't use a business card case.
 2       Q.   Did you own one at the time?
 3       A.   I might have.
 4       Q.   Was it metallic?
 5       A.   Yes.
 6       Q.   Do you recall whether or not
 7   you had that with you on this particular
 8   evening?
 9       A.   No.
10       Q.   You don't remember?
11       A.   No.
12       Q.   How long did you keep your
13   hands out of your pockets for when you took
14   your wallet and your cell phone out of your
15   pockets?
16       A.   I don't remember.
17       Q.   At any time did you return your
18   hands to your pockets before they grabbed
19   you?
20       A.   No.
21       Q.   How long after you took your
22   wallet and cell phone out of your pockets
23   did they grab you?
```

BOTTARI

```
 1       A.   Very briefly.  I would say
 2   approximately five to -- about five
 3   seconds.
 4       Q.   Could it have been less than
 5   five seconds?
 6       A.   It's possible.
 7       Q.   Where were your hands when they
 8   grabbed you?
 9       A.   My hands were near my
10   shoulders.
11       Q.   Were they being held straight
12   out in front of you or were your elbows
13   bent?
14       A.   My elbows were bent.
15   (indicating).
16            MR. FLAMM:  Were they like this
17   (indicating)?
18            THE WITNESS:  Exactly.
19       Q.   Were you holding the wallet and
20   cell phone up in your hands?
21       A.   Yes.
22            THE WITNESS:  I am going to get
23   some water.
24            (Whereupon, a short recess was
```

BOTTARI

```
 1   taken.)
 2       Q.   From the time you removed your
 3   hands from your pockets until the time you
 4   were grabbed by the officers, did either of
 5   them say anything else?
 6       A.   I don't remember.
 7       Q.   There was no response from them
 8   prior to them grabbing hold of you?
 9       A.   There was no response.
10       Q.   Did you say anything?
11       A.   Yes.
12       Q.   What did you say?
13       A.   "What are you doing?"
14       Q.   Did you say anything else?
15       A.   No.
16       Q.   Did both Officer Stephenson and
17   Sergeant Fischer take hold of you?
18       A.   Yes.
19       Q.   What portion of your body did
20   Officer Stephenson take hold of?
21       A.   My left arm, left shoulder.
22       Q.   With both of his hands?
23       A.   With both of his hands.
24       Q.   What part of your body did
```

BOTTAI

```
 1   Sergeant Fletcher take hold of?
 2   A.  My right arm.
 3   Q.  Did you resist after they took
 4   hold of you?
 5   A.  I don't recall.
 6       MR. FLANN:  Objection.
 7       You can answer.
 8   A.  No.
 9   Q.  Did you pull your arms away
10   from the officers?
11   A.  No.
12   Q.  Did the three of you fall to
13   the ground?
14   A.  No.
15   Q.  Did any of you fall to the
16   ground?
17   A.  Both.
18   Q.  How long after they took hold
19   of your arms did you end up on the
20   ground?
21   A.  A second or two.
22   Q.  Did either Sergeant Fletcher or
23   Officer Stephenson also end up on the
24
25
```

BOTTAI

```
 1   ground?
 2   A.  Parts of their body were on
 3   ground.
 4   Q.  What portion of your body hit
 5   the ground first?
 6   A.  The front portion.
 7   Q.  By that, you mean your chest or
 8   your stomach, or your knees or your face or
 9   all of the body?
10   A.  I was pretty much slammed to
11   the ground.  I don't recall which body
12   parts hit the ground first.
13   Q.  What portion of either of the
14   police officers hit the ground?
15   A.  I know that parts of their body
16   was on top of me, but not their entire
17   body, so I was face first on the
18   body, so I don't recall what parts of their
19   don't recall what parts of their body were
20   on me.
21   Q.  Was it some parts of their body
22   other than their hands?
23   A.  Some part of the front of their
24
25
```

BOTTAI

```
 1   body other than their hands, chest,
 2   stomach?
 3   A.  I don't recall.
 4   Q.  Were both officers on top of
 5   you after you were on the ground or just
 6   one?
 7   A.  Both.
 8   Q.  Did either of them respond to
 9   you when you asked them what they were
10   doing immediately taking hold of your arms?
11       MR. FLANN:  Asked and answered.
12       You can answer it again.
13   A.  No.
14   Q.  How long did you remain on the
15   ground for?
16   A.  Five maybe ten minutes.
17   Q.  While you were on the ground,
18   did you feel pain in any part of your body?
19   A.  Yes.
20   Q.  What parts of your body?
21   A.  My knee, shoulder, my -- above
22   my left eye, my side.
23   Q.  Anything else?
24   A.  I don't think so.
25
```

BOTTAI

```
 1   Q.  Which knee were you feeling
 2   pain in while you were on the ground?
 3   A.  I don't remember at this point.
 4   Q.  How about the shoulder, which
 5   shoulder was hurting?
 6   A.  I don't remember.
 7   Q.  Was it the left side that hurt?
 8   A.  I don't remember.
 9   Q.  Were you bleeding from any part
10   of your body while you were on the ground?
11   A.  Yes.
12   Q.  Where were you bleeding from
13   while you were on the ground?
14   A.  Above my left eye.
15   Q.  While you were on the ground,
16   did they handcuff you?
17   A.  Yes.
18   Q.  Hands behind your back?
19   A.  Yes.
20   Q.  Do you know which officer
21   handcuffed you?
22   A.  Stephenson.
23   Q.  During the time that you were
24   lying on the ground, did you overhear any
25
```

BOTTARI                                                      49

```
 1    conversation between the two officers?
 2    A.   No.
 3    Q.   Did you have any conversation
 4    with either of the two officers while you
 5    were on the ground?
 6    A.   No conversation.
 7    Q.   Did you say anything while you
 8    were lying on the ground?
 9    A.   Yes.
10    Q.   What did you first say while
11    you were on the ground?
12    A.   Yes.
13    Q.   Repeat the question please.
14    A.   What were the first words you
15    uttered after you came to the ground?
16    A.   "You can have my arm. You
17    don't need to twist it. I am not
18    resisting."
19    Q.   Did that elicit a response from
20    either of the officers?
21    A.   Verbal response, no.
22    Q.   Any other type of response?
23    A.   I know I got hit in the back of
24    my head and neck.
25         Was that -- how long --
```

BOTTARI                                                      50

```
 1    A.   I don't know if that was a
 2    response or just their standard practice.
 3    Q.   How long after you went to the
 4    ground did you feel a blow to your head?
 5    A.   It was quick. I have to say
 6    seconds.
 7    Q.   Was it before or after you said
 8    you can have my arm?
 9    A.   After.
10    Q.   Was it before or after the
11    handcuffs were applied?
12    A.   That, I don't recall.
13    Q.   Did you say anything else while
14    you were on the ground?
15    A.   Yes.
16    Q.   What else did you say while you
17    were on the ground?
18    A.   I said, in essence, "you guys
19    really fucked up. My face is bleeding. I
20    am cut." I expressed disbelief. "I can't
21    believe you guys did this."
22    Q.   At any time prior to them
23    grabbing your arms, did you advise them you
24    were a former prosecutor?
25    A.   No.
```

BOTTARI                                                      51

```
 1    A.   Yes.
 2    Q.   How long before they grabbed
 3    your arms did you advise them you were a
 4    prosecutor?
 5    A.   I'm sorry. I didn't inform
 6    them before they grabbed my arms
 7    Q.   Did you tell them you were an
 8    attorney before they grabbed your attorney?
 9    A.   No.
10    Q.   At what point did you first
11    advise them that you were an attorney?
12    A.   As they were grabbing my arms
13    and throwing me to the ground.
14    Q.   What did you say?
15    A.   I said, "wait a second, I am a
16    former prosecutor."
17    Q.   Did they respond at all to that
18    statement?
19    A.   No.
20    Q.   At any time did you tell them
21    you were refusing to remove your hands from
22    your pockets?
23    A.   No.
24    Q.   Did you at any time tell them
```

BOTTARI                                                      52

```
 1    you were leaving despite the fact that they
 2    asked you to stay?
 3    A.   No.
 4    Q.   Did you hear either of them say
 5    anything during the time that you were on
 6    the ground?
 7    A.   After I was handcuffed, they
 8    called for an ambulance.
 9    Q.   Did you get up off the ground
10    before they called the ambulance?
11    A.   No.
12    Q.   Did you hear what they said
13    when they called the ambulance?
14    A.   I did.
15    Q.   What did the officer who called
16    the ambulance say?
17    A.   I don't remember.
18    Q.   At any time prior to them
19    render you any first aid at the scene?
20    A.   No.
```