```
STATE OF NEW YORK : COUNTY OF WESTCHESTER
TOWN COURT : TOWN OF ARDSLEY
-----------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

         -against-

ANDREW BOTTARI,

              Defendent.
-----------------------------------x
                        505 Ashford Avenue
                        Ardsley, New York 10502
                        October 27, 2005
                        8:23 p.m.


B E F O R E :    HON. WALTER M. SCHWARTZ
                 TOWN JUSTICE




         S U P P R E S S I O N    H E A R I N G




                CARBONE & ASSOCIATES, LTD.
                   Jennifer A. Luongo
              111 North Central Park Avenue
                  Hartsdale, New York 10530
                       (914) 684-0201
```

```
                                                    2
 1                   A P P E A R A N C E S:
 2
 3
 4
 5       JEANINE PIRRO, ESQ.
 6       District Attorney for the People
 7       111 Grove Street
 8       White Plains, New York 10601
 9       BY:  KIERAN BYRNE, ESQ.
10       ASSISTANT DISTRICT ATTORNEY
11
12
13
14
15
16       ROCCO D'AGOSTINO, ESQ.
17       Attorney for the Defendant
18       445 Hamilton Avenue
19       White Plains, New York 10601
20
21
22
23
24
25
```

Proceedings
                                                                3

1         THE COURT:  This is a suppression
2    hearing in the case of the People against
3    Andrew Bottari.  Mr. Bottari is charged
4    with three Penal Law charges; two
5    misdemeanors and one violation.  They are
6    Obstructing Governmental Administration in
7    the Second Degree and Resisting Arrest;
8    both are misdemeanors, and Disorderly
9    Conduct, a violation under the Penal Law.
10   The application was made in the form of a
11   letter, treated as a motion, dated May
12   27th, 2005 and the People have consented
13   to this hearing tonight.
14        Would counsel please identify
15   themselves?
16        THE PEOPLE:  Yes, Your Honor,
17   Kieran Byrne for the Westchester District
18   Attorney's office.
19        MR. D'AGOSTINO:  Rocco D'Agostino,
20   445 Hamilton Avenue, White Plains, New
21   York, for the defendant, Andrew Bottari.
22        THE COURT:  We are also noting the
23   presence of the clerk in the courtroom.
24        THE PEOPLE:  Your Honor, before we
25   begin at this time there are one or two

Proceedings
                                                                4

1    preliminary matters.  First, I have all
2    ready informed Mr. D'Agostino of this.  We
3    are just filing superseding information,
4    Your Honor.  It's the same charges as Your
5    Honor, three counts, Obstructing
6    Governmental Administration in the Second
7    Degree, one count of Resisting Arrest and
8    one count of a Violation of Disorderly
9    Conduct.  On one page, Your Honor, it's
10   been executed by Officer Michael
11   Stephenson.
12        MR. D'AGOSTINO:  Your Honor, I have
13   acknowledged receipt and respectfully
14   reserve the right to make comments and to
15   also offer objections, if I find any,
16   after the conclusion of today's date.  But
17   I do acknowledge receipt for the time
18   being.
19        THE COURT:  I will note that the
20   date and the paper called misdemeanor
21   information is filed on October 27th, 2005
22   at 8:25 p.m. and the defendant reserves
23   his other rights with respect to this
24   instrument.  I'm just looking over it now.
25        THE PEOPLE:  Technically, Mr.

Page 5

Bottari should be arraigned on the new documents.

THE COURT: I believe you are correct. All right, I finished reading it. You could either waive the reading or acquire the court to allow that.

MR. D'AGOSTINO: Your Honor, at this point I waive a reading, but not the rights thereunder. I respectfully request the court to enter my client's plea of not guilty to all three of these charges, again, subject to my client's reservation of his rights to object to the filing in the first place.

THE PEOPLE: Your Honor, the people are ready and Your Honor, because he has been arraigned we are reserving the 71030 Notice, it's the same 710.30 Notice that was served. I have provided it to Mr. D'Agostino prior to tonight, the Rosario packet and one of the last documents there is the 71030 Notice, it's the exact same one dated March 23rd, 2005. He will consent.

MR. D'AGOSTINO: Receipt

Page 6 — Proceedings

acknowledged, Your Honor.

THE COURT: All right, that is noted.

THE PEOPLE: Your Honor, as I just indicated, I have provided to Mr. D'Agostino a packet regarding all the relevant Rosario Material for this evening's pre-trial hearing. With that being said Your Honor, I believe we are ready to proceed.

THE COURT: All right then if you have the first witness, please call.

THE PEOPLE: Yes, Your Honor. People are calling Police Officer Michael Stephenson, he is in the hallway. With your permission I am going to call him in.

THE COURT: Certainly.

(Whereupon, the witness was called into the courtroom.)

M I C H E A L   S T E P H E N S O N, a witness called on behalf of the People, having first been duly sworn by the Court, was testified and examined as follows:

DIRECT EXAMINATION BY MR. BYRNE:

Q   Officer Stephenson, by whom are you

Page 7 — Proceedings

employed?

A   Village of Ardsley Police Department.

Q   Before you were employed by the Village of Ardsley Police Department, by whom were you employed before that?

A   City of Mount Vernon Police Department.

Q   How long were you employed by the City of Mount Vernon Police Department?

A   Approximately two and a half years.

Q   Approximately, how long have you been employed by the Ardsley Police Department?

A   To date, approximately three years.

Q   Officer, I would like to direct your attention to March 3rd of 2005. Were you working that day?

A   Yes.

Q   What shift were you working?

A   Midnight to 8 in the morning.

Q   What was your detail?

A   I was on patrol, assigned to a marked vehicle.

Q   Officer, I would like to direct your attention to approximately 12:22 a.m., did you

Page 8 — Proceedings

have an opportunity to come in contact with Andrew Bottari?

A   Yes, I did.

Q   Where did that occur?

A   In the C.V.S. parking lot on Saw Mill River Road in the Village of Ardsley.

Q   You said there is a C.V.S., are there any other facilities there?

A   Yes, there is a strip mall, other stores are located in that place.

Q   Prior to this evening, have you had any experiences in that area, that strip mall, the C.V.S. area?

THE COURT: Prior to that evening?

THE PEOPLE: Yes, Your Honor.

Q   Have you had any activity in your duty as a police officer, in the Village of Ardsley?

A   Yes.

Q   What were those activities?

A   I responded on numerous types of complaints; burglar alarms, larcenies to the store, suspicious behavior or activity in the woods just adjacent in the woods to the C.V.S.

Q   Officer, you said at this time at

Proceedings 9

approximately 12:22, you did have an opportunity to come in contact with Andrew Bottari?

A   Yes.

Q   Where was he specifically located?

A   I was traveling down, I was traveling south on Saw Mill River Road, and as I passed the parking lot, I observed a black S.U.V. facing west, facing in a westerly direction with the back of the vehicle parked towards the entrance way or the front doors of the C.V.S. store. (Indicating)

Q   What did you do when you made this observation?

A   I observed the back hatch of the vehicle opened, so as I continued southbound, I made a left-hand turn onto Center Street traveling in an easterly direction and then made a left-hand turn into the parking lot.

Q   When you went into the parking lot, what, if anything, did you observe?

A   I observed an individual standing at the rear of the vehicle, immediately looks in my direction, steps back and quickly closes the hatchback of the vehicle.

THE COURT:   I'm sorry, you said

Proceedings 10

closed it?

A   Yes.

Q   Does there come a point in time you have an opportunity to speak to this individual?

A   Yes, as I approached the vehicle the individual is walking away from the back of the vehicle, walking towards, kind of away from his vehicle but towards where he kind of-- I guess assumes that I am going to pull up.

Q   Just so it is clear, at this point when you say approach, you are approaching in your police vehicle?

A   I'm approaching with my police vehicle, yes.

Q   Did there come a point in time when you have an opportunity to speak to this individual in the parking lot?

A   Yes.

Q   What is the sum and substance of that conversation?

THE COURT:   When you do have this conversation before you get to the sum and substance, are you in your vehicle?  Where are you, where is he?

A   I am in my vehicle, he is out of

Proceedings 11

his vehicle.  I pulled up and speaking through the passenger window of the vehicle I said, how are you doing tonight, and he said fine.  I said can I ask what are you doing, he said I don't think I want to tell you that and I said, you don't, he says no.  I said, well, maybe you can tell me your name, he said I don't think I want to tell you that either.  I said you don't, and he says no, in fact I don't think I want to answer any of your questions and he said I'm leaving and I said hold on a second.

So, at that point I put the vehicle in park and I stepped out-- let me back up.  Before I stepped out of the vehicle I asked for another patrol unit to come to the area.  So, at that point I stepped out of the vehicle, and walked towards the back corner panel of the vehicle, I had the vehicle between myself and was later identified as Mr. Bottari, between myself and him.  (Indicating)

Q   Officer, I'm going stop you right there.  This initial conversation, we will call it that, can you describe Mr. Bottari's demeanor?

A   He appeared excited.  As best I can describe it.

Q   As a result of the conversation, you radioed for backup and at some point, you exit

Proceedings 12

your vehicle?

A   Yes.

Q   After you exited your vehicle, did you have any subsequent interaction or conversation with the defendant?

A   Yes.  As I stepped out of the vehicle I said, what's your name, he says I don't want to tell you my name.  I said, can we start with you please taking your hands out of your pockets?

Q   When you say can you please take your hands out of your pockets, why is that you asked him that question?

A   As far as my safety and his safety, I don't know if he is concealing something in his pockets.

Q   When you say his hands are in his pockets, can you describe to the court what type of pockets where his hands were and where exactly were they located?

A   Sure, he had a jacket on that was maybe a little bit longer than waist length.  He had his hands in his front pockets of that jacket.

THE COURT:   Like breast pockets?

A   No, around the waist area.

## Page 13

(Indicating)

THE COURT: Okay.

Q You asked him to remove his hands from his pockets for safety concern. How does he respond, if at all?

A The first time I asked him, he said I am not taking my hands out of my pockets.

Q Did you ask him again, a second time?

A Yes, I asked-- it had to be at least a half a dozen times to remove his hands from his pockets. Each time I asked him, he continues to state I'm not taking my hands out of my pockets, I am not doing anything you ask me to do I want to get out of here. I'm leaving.

Q Officer, you indicated earlier that you had radioed for backup?

A Yes.

Q Did there come a point in time when backup arrived?

A Yes, Sergeant Fisher arrived at a point when I was asking Mr. Bottari to remove his hands from his pockets.

Q When Sergeant Fisher was there, did you have any further conversation or interaction

## Page 14

with Mr. Bottari?

A Um, my conversation with Mr. Bottari was continued of please remove your hands from your pockets, at one point he stated to me, I am an attorney, I don't have to do anything you say. At which point Sergeant Fisher stated to him--

THE COURT: You heard this?

A Yes. Sergeant Fisher stated to him, if you are an attorney then you understand for our safety that you need to take your hands out of your pockets.

Q Officer, when you and Sergeant Fisher asked Mr. Bottari to remove his hands from his pockets, where are you located? Where are you located; where is Mr. Bottari located; where is the Sergeant located?

A I am still standing on the left side of my vehicle by the trunk area on the left rear corner bank, I guess you would say. Mr. Bottari is probably directly in front of me, maybe 5 feet off of my vehicle. So, Sergeant Fisher-- the vehicle is parked to my left, kind of facing my vehicle. He is out of his vehicle standing. I'm not even exactly sure to be honest with you where

## Page 15

Sergeant Fisher was standing.

Q Approximately, how far away in feet, if that's appropriate, are you from Mr. Bottari?

A Myself personally?

Q Yes, yourself personally.

THE COURT: This is after Sergeant Fisher has arrived?

A Yes. Eight feet at the most.

Q You have indicated that you repeatedly asked him to take his hands out of his pockets. To the best of your recollection, approximately how many times did you ask him?

A I'm going to say at least 6, maybe 8 or 9 times.

Q Did there come a point in time when you asked him again?

A Yes, after I had asked him repeatedly and at one point he stated, I am an attorney, I don't have to do what you ask. Sergeant Fisher stated to him, if you are an attorney then you know for our safety that you need to take your hands out your pockets. At which point he replied, do you want me to take my hands out of my pocket? I'm going to take my hands out

## Page 16

of my pockets, and he quickly removed his hands and came out pointing one hand in my direction and pointing another hand in Sergeant Fisher's direction. I could never tell what he had in his hands other than, one was a silver object and one was a black object because he just quickly pulled them out and he put them back in. (Indicating)

THE PEOPLE: Your Honor, I just ask the record reflect that the officer is indicating with his hands, he had his fist clenched, he pulled his right arm and left arm out, he pointed them so that his arms are stiff.

THE COURT: I don't know if I would use the word clench to hold something in your hand. You need to tighten your fingers to a certain extent, just as I am holding a cup right now. But I can't say that my fist is clenched, it's not. (Indicating) I am holding a cup, so I don't know if that's the way to explain it but I will ask the officer. With regard to these objects which have not been identified, so I don't know if they are a paper clip or anything else. Can you

Proceedings 17

describe the hands, can you verbalize how his hands appeared to you while holding these objects in the two hands?

A   He appeared to be grasping or securing with his hands an object that was probably a little bit bigger than his palms in both hands. (Indicating) That one was, I think was either silver or gold and the other one was black.

THE COURT:  At that moment, could you tell what they were?

A   No, I could not.

THE COURT:  Okay, Mr. Byrne.

THE PEOPLE:  Thank you.

Q   You indicated that he put his hands back in his pockets?

A   Yes, that is correct.

Q   After that, what if anything, happens next?

A   After he does that, he turns around and begins to walk back to his vehicle at which point myself and Sergeant Fisher begin to walk towards him, and I quickly walked towards him and at which point he began to turn around and I believe I secured his left hand with mine, my hands, and Sergeant Fisher secured his right hand.

Proceedings 18

Q   When you say secured, can you describe what you mean by that term to the court?

A   I took hold of his arm, maybe his forearm and his hand, just around his wrist area with both of my hands. (Indicating)

Q   To the best of your recollection, did you see how Sergeant Fisher secured the defendant?

A   No.  I know he had control of his arm, I don't know if it was with one hand or two hands, I don't recall.

Q   Fair enough.  Officer, why is it at that point that you approach and secure the defendant's hands?

A   At this point his behavior is leading me to believe that he has something in his pockets that could possibly harm me.  I am thinking of my safety at this point and the safety of Sergeant Fisher.  So, I quickly approached him and I wanted to secure his arm to make sure that he couldn't come out of his pockets with anything, any type of weapon or, you know, whatever he was hiding inside of his pockets.

Q   After you and Sergeant Fisher secure Mr. Bottari's arms, what happens next?

Proceedings 19

A   Sergeant Fisher stated to Mr. Bottari, he said I want you to take your hands out of your pockets slowly and don't come out of your pockets with anything.  At that point, Mr. Bottari points his arms out and away, out of his pocket and away from Sergeant Fisher and pushed him as far as, you know, hitting his arms and his chest.

Q   When you say push, can you describe how it is that he pushed him?  What kind of force that he pushed it?

A   Pushed him in his chest.

THE COURT:  With his right hand?

A   Yes.  (Indicating)

Q   As a result of this push, what, if anything, do you and Sergeant Fisher do?

A   At that point, we immediately start arresting him.  Sergeant Fisher grabbed him, as did I, and the three of us started wrestling and we ultimately fell down to the ground.  Sergeant Fisher was first onto the ground, Mr. Bottari following him and I was on top of Mr. Bottari.

Q   When you say you started wrestling, why is it that wrestling started?

A   At that point, Mr. Bottari was under arrest and we were going to--

Proceedings 20

THE COURT:  Pardon me a minute.  That's conclusion when you say at that point he was under arrest.  State the facts, please.

A   At that point we were going to place him under arrest.

THE COURT:  You were going to place him under arrest?

A   Yes, we were trying to place him in custody because he was now, in our view, he was fighting with an officer, he was resisting our commands on instructions on what to do and now he engaged in physical force.

Q   When you attempted to place him under arrest, how does Mr. Bottari react?  What happens?

A   He starts resisting.

THE COURT:  Can you please read that back?

(Whereupon, the last question was read back by the reporter.)

Q   Officer, let's just back up for one second.  Why is that you were trying to place the defendant under arrest?

A   At that point, he had obstructed

**Page 21**

```
 1   governmental administration, in our view, he
 2   engaged--
 3              THE COURT:  Pardon me, when you say
 4   in our view you can say in your, view if
 5   that's the case.
 6        A    Okay, my view.
 7              THE COURT:  Okay.
 8        A    And he had pushed an officer,
 9   engaged in fighting.
10        Q    Officer, you indicated that
11   wrestling occurs.  Yourself, the Sergeant and Mr.
12   Bottari all ended up on the ground.  Did there come
13   a point in time when, in fact, the defendant is
14   placed under arrest?
15        A    Yes.  When we got him on the
16   ground, I should say when we fell to the ground, I
17   told him he was under arrest.  I asked him to stop
18   fighting and he said I'm going to stop, I'm going
19   to stop.
20              THE COURT:  Excuse me, I'm sorry?
21   Please start with your answer again.
22              THE PEOPLE:  I believe he indicated
23   he told Mr. Bottari stop fighting.  Mr.
24   Bottari said okay, okay, and at that
25   point--
```

**Page 22**

```
 1              THE COURT:  Can you read that back
 2   please?
 3              (Whereupon, the last question
 4              was read back by the reporter.)
 5        Q    Officer, there does come a point
 6   and time where he is handcuffed, is that correct?
 7        A    That is correct.
 8        Q    After he is handcuffed, what, if
 9   anything, do you do?
10        A    I'm Mirandizing him.
11        Q    When you say you are Mirandizing,
12   how is that you are Mirandizing him?
13        A    I stated his rights to him.
14        Q    What I would like you to do now is
15   to demonstrate to the court the same capacity that
16   you Mirandized Mr. Bottari that evening?
17        A    I advised him that he had the right
18   to remain silent, he had the right not to answer
19   any of my questions, anything that he said could
20   and would be used against him in the court of law.
21   I told him that he had a right to have an attorney
22   present during the questioning.  I told him he
23   could stop answering my questions at any time and
24   that if he could not afford an attorney, an
25   attorney would be provided for him.
```

**Proceedings**

**Page 23**

```
 1        Q    Did you ask him if he understood
 2   these rights?
 3        A    Yes, I did.
 4        Q    How did he reply?
 5        A    I understand.  Then actually,
 6   before I read him his rights we asked for a
 7   ambulance to respond to the scene, if I remember
 8   correctly.
 9        Q    Why did you ask for an ambulance to
10   respond?
11        A    Mr. Bottari had a cut above his
12   eye, I don't recall which eye, but he had an
13   laceration, I guess that he sustained when he fell.
14   (Indicating)
15        Q    Did there come a point in time when
16   an ambulance, in fact, arrives?
17        A    Yes.
18        Q    Does the defendant get in that
19   ambulance?
20        A    Yes.
21        Q    Where is the defendant taken?
22        A    To Dobbs Ferry Hospital.
23        Q    Did you accompany the defendant to
24   Dobbs Ferry Hospital?
25        A    Yes, I do.
```

**Page 24**

```
 1        Q    Does there come a point in time at
 2   the Dobbs Ferry Hospital you have an opportunity to
 3   have contact with Mr. Bottari again?
 4        A    Yes.
 5        Q    Do you have a conversation with Mr.
 6   Bottari again at the hospital?
 7        A    Um, I wouldn't say conversation, I
 8   would say Mr. Bottari made various statements to
 9   me.
10        Q    When he made various statements,
11   what did those statements consists of?
12        A    Mr. Bottari advised me that he had
13   a fight with his wife that evening and that he was
14   just in the parking lot to sleep.  He said I should
15   have answered your question, I don't know what I
16   was thinking.  He apologized numerous times.
17        Q    Officer, do you see the individual
18   in the courtroom tonight that you saw in the
19   parking lot that evening?
20        A    Yes.
21        Q    The C.V.S. parking lot?
22        A    Yes.
23        Q    What I am going to ask you now is
24   if you could point to him and identify him for the
25   court and also identify him by an article of
```

**Page 25**

```
 1  clothing for the court?
 2       A    Mr. Andrew Bottari with a blue tie
 3  and white strips. (Indicating)
 4            THE PEOPLE:  Your Honor, I just ask
 5  the record to reflect that he has
 6  positively identified the defendant.
 7            THE COURT:  Yes, the defendant is
 8  identified.
 9            THE PEOPLE:  Your Honor, I have
10  nothing further at this time.  Off the
11  record for a second, please.
12            (Whereupon, an off the record
13  discussion took place.)
14  CROSS EXAMINATION BY MR. D'AGOSTINO:
15            THE COURT:  Okay, Mr. D'Agostino.
16            MR. D'AGOSTINO:  Thank you.
17       Q    Good evening, Officer.
18       A    Good evening.
19       Q    You did the midnight shift that
20  night?
21       A    Yes.
22       Q    Did you arrive right at 12 o'clock
23  or did you start your tour early or late?
24       A    Usually, I arrive at 20 of the
25  hour.  We have a time period where we secure our
```

**Page 26**

```
 1  equipment, read what we call our blotter reports
 2  from the previous tours and then usually by 10 of
 3  the hour, or at the hour, you are out on patrol.
 4       Q    Were you alone in your car?
 5       A    Yes, I was.
 6       Q    Then approximately at what time did
 7  you get in your car from the police station?
 8       A    I would--
 9            THE PEOPLE:  Objection, Your Honor.
10  Irrelevant.
11            THE COURT:  I will allow it.  We
12  will see where it goes.
13       A    I would say at midnight, maybe
14  shorty thereafter.
15       Q    Approximately 22 minutes after
16  midnight, you encountered Mr. Bottari, correct?
17       A    Yes.
18       Q    You had already gone past C.V.S.
19  in a northerly direction at some point prior to
20  12:22, is that correct?
21       A    No.
22       Q    Did you testify that you were
23  passing C.V.S. in a southerly direction?
24       A    Yes.
25       Q    Where did you start your tour that
```

Proceedings

**Page 27**

```
 1  evening?
 2            THE PEOPLE:  Objection, Your Honor,
 3  irrelevance.
 4            THE COURT:  I will allow it.
 5       A    I started my patrol out of the
 6  parking lot here. (Indicating)
 7       Q    At some point you traveled north of
 8  here and then turned south again before you passed
 9  to C.V.S., correct?
10       A    No.
11       Q    How did you arrive at C.V.S.?
12            THE PEOPLE:  Objection, Your Honor.
13  Irrelevant, I don't see the point.
14            THE COURT:  Overruled.  We'll see
15  where it's going.  I am not going to let
16  it go too far.
17       A    When I pull out of this parking lot
18  either north or south, I don't know which direction
19  I went that night, but I know at first point that I
20  ended up on Saw Mill River Road.  I was coming off
21  of Heatherdell Road traveling in a westerly
22  direction and then proceeded south on Saw Mill
23  River Road.
24       Q    And you looked to your left and you
25  saw Mr. Bottari?
```

Proceedings

**Page 28**

```
 1       A    Correct.
 2       Q    The first time you noticed Mr.
 3  Bottari, what was he doing?
 4       A    The first time I noticed Mr.
 5  Bottari or the vehicle?
 6       Q    Mr. Bottari?
 7       A    When I pulled into the parking lot
 8  that was the first time I saw the individual, later
 9  identified as Mr. Bottari.  That individual was
10  standing at the rear of his vehicle with the
11  hatchback opened, looking in my direction and then
12  quickly shut the rear of the vehicle. (Indicating)
13       Q    When you say looking at his
14  direction, could you tell the court what Mr.
15  Bottari body's position was with respect to C.V.S.?
16       A    His back was to the front doors of
17  the C.V.S. store.
18       Q    So, he was looking over his left
19  shoulder in your direction?
20       A    Yes.
21       Q    As you proceeded in a northerly
22  direction along the parking lot, correct?
23       A    Correct, in the parking lot,
24  correct.
25       Q    Were there other vehicles in the
```

Proceedings 29

```
parking lot?
     A    No.
     Q    Were there any other people in the
parking lot?
     A    None.
     Q    Were there any people walking along
the sidewalk or on the street at that time?
     A    No.
     Q    Were you, at that time,
investigating any alarm calls?
     A    No.
     Q    Were you investigating any
larcenies?
     A    No.
     Q    Were you investigating any
burglaries?
     A    No.
     Q    Were you investigating any other
alleged criminal activity at that time?
     A    I don't know if I understand?  I
was investigating the situation.
     Q    What you saw?
     A    What I saw.
     Q    It was not based on any radio calls
that had come to you or anything that you learned?
```

Proceedings 30

```
     A    Not based on a radio call.
     Q    You indicated on your direct
examination that in the past there has been
activity in that area including larcenies,
suspicious behavior and alarms, is that correct?
     A    Correct.
     Q    On how many occasions have you
responded in that particular area?
          THE COURT:  Up to that time?
     Q    Up to that point in time?
     A    Over the course of, I would guess
at the time it was two years.  I have no idea.  I
would have to go back, I would have to go back.
          THE COURT:  Well, you say you have
no idea.  Was it more than once, more than
10 times?
     A    More than 10 times, yes.
     Q    Isn't it a fact, Officer, that you
never once responded to a burglary at C.V.S. in all
your years at Ardsley Police Department?
     A    That's false.
     Q    When, on one occasion did you
respond to a burglary?
          THE PEOPLE:  Objection, Your Honor.
          THE COURT:  I'm going to allow it.
```

Proceedings 31

```
Let me understand what the question is.
When you say at C.V.S., refer to that as
the C.V.S. parking lot.  There is a lot of
other stores.  I don't know what you mean.
     Q    The question is, have you ever
responded to a burglary in the C.V.S. parking lot?
     A    A burglary or a burglary alarm?
     Q    A burglary?
     A    No.
     Q    Earlier when you stated that in
your prior experiences you specifically did not
state burglary, as a prior experience in that area?
     A    No, I never responded on a burglary
at that location.
     Q    Earlier in your testimony you
mentioned about prior experiences, were you
referring just to your own experiences or
experiences including those of others in Ardsley
Police Force with respect to that area?
     A    I am well aware of my own
experience, as well as the incidents of other
officers responding to that location.
     Q    You mentioned Mr. Bottari, at that
time to you, appeared to be acting in a suspicious
manner, is that right?
```

Proceedings 32

```
     A    I would--
          THE PEOPLE:  Objection, Your Honor,
I don't believe he testified to that.  I
believe he used the term nervous, Your
Honor.
          THE COURT:  As to form, sustained.
I don't believe he used that term, he may
have described that conduct, but he didn't
use the term, you can ask him.
          MR. D'AGOSTINO:  Well, it is cross
examination.
     Q    Were you suspicious of Mr. Bottari
and/or his behavior at that moment when you first
saw him?
     A    When I first saw him, I was
suspicious of what he was doing.
     Q    When you say suspicious, are you
saying you were suspicious that he was engaged in
the commission of a criminal act?
     A    I don't know at that point.  I am
questioning him as to who, you know, who he was and
what he was doing.
     Q    What, in fact, did you think he was
doing at that time?
     A    When I initially asked him, I had
```