6B

no idea.

Q Why did you ask him what he was doing?

A Because I thought it was unusual for a vehicle to be parked in that location at that time of evening with the hatchback open and somebody standing at the rear of it.

Q Were you suspicious that Mr. Bottari was about to commit a criminal act?

A I don't know what he was about to do.

Q When you first saw Mr. Bottari, can you tell the court what the position of his hands were with respect to his body and/or his pockets?

A He was closing the hatch of his trunk of his vehicle. (Indicating0

Q Do you remember what color his jacket was?

A No, I think it was a dark colored jacket. I'm not a hundred percent sure.

Q At any point during this entire encounter, were there other people around the area other than yourself or Sergeant Fisher and Mr. Bottari?

A To my knowledge, no.



Q Were there any other vehicles other than your patrol car, Sergeant Fisher's patrol car and Mr. Bottari's car in that parking lot at any time throughout the entire encounter?

A No, not that I'm aware of.

Q Do you know if there were any other witnesses to anything that occurred in that parking lot in that evening?

A No.

Q Has anybody since reported to you as being a witness?

A No.

Q At the moment that Mr. Bottari closed his hatchback, were you actually observing him?

A Yes.

Q You saw him close his hatchback, correct?

A Correct.

Q Were you still in your patrol car at that time?

A Yes, I was still driving towards him.

Q You mentioned that his hatchback was parked as if he backed in towards C.V.S. at his



rear, correct?

A Correct.

Q Isn't it a fact that where he was parked actually is a lined parking lot within the C.V.S. parking area?

THE COURT: Striped line?

MR. D'AGOSTINO: Yes, striped line.

A Yes, they're striped at an angle, a degree of an angle.

Q He was parked within the lines, correct?

A No.

Q Was he parked in some way skewed?

A Yes, well the lines-- again I don't know what degree the lines are because when you enter the parking lot you are traveling in a northerly direction. It's a one-way and the parking spaces are angled accordingly, so he was parked directly in line or it's perpendicular or whatever, straight to the doors, so it's impossible for him to be directly in one line. (Indicating)

THE COURT: He was parked straight to the doors? In other words, facing the back wall, that is straight?

A Yes, his vehicle was not on an



angle. His vehicle was facing west.

THE COURT: Facing west, okay. I understand. So, the back of his vehicle is facing east?

A Yes.

Q Were all of the stores and business establishments within that strip mall closed at that hour?

A Yes.

Q Were there lights on or off to your recollection?

A In the stores, off.

Q What was the lighting condition in the parking lot at that time?

A I would say poor, not poor, but I mean it wasn't a well lit area.

Q Did you have a flashlight with you at that time?

A Yes, I had one in the vehicle.

Q Were you using it at the time that you first approached Mr. Bottari?

A No, I was in the vehicle when I was approaching him.

Q At the time that you exited the vehicle, did you have your flashlight with you?

A No.

Q Did Sergeant Fisher, to your knowledge, have his flashlight with him?

A I don't recall.

Q At any time, did you enhance the lighting in the viewing of Mr. Bottari by shining a flashlight on him, either yourself or Sergeant Fisher, to your knowledge?

A Not that I recall. I may have, again, I may have used a spotlight but I don't recall to enhance the lighting. I don't recall.

Q From the time Mr. Bottari closed the hatchback, how much time would you say passed until he put his hands into his pockets?

A Less than 30 seconds.

Q Can you describe his movements from the time he closed the hatchback?

A Yes, as I stated before, after he closed the hatchback he began to walk away from the corner of his vehicle and he was walking away from his vehicle as if he knew that he was-- obviously he observed me driving up and, like, he was going to engage me in a conversation. He was walking towards me. (Indicating)

Q It's your testimony he was actually





walking in a southerly direction?

A I would say more of a, like, southwest direction. (Indicating)

Q Where was your vehicle at that point? Was it moving or was it stationed?

A He was walking and I was moving and we ultimately came to a stop.

Q How far away was the front of your car to the rear of his?

A From the rear of his, a car length.

Q Was he walking with his hands in his pocket or hands out of his pocket?

A I don't recall at that point.

Q Did you notice any bulges in his pockets at that time?

A No.

Q When did you next see him put his hands in his pockets?

A When I got out of my vehicle and I went to talk to him is when I remember seeing his hands in his pockets.

Q When is the first time that you asked him to take his hands out of his pockets?

A When I was outside of my vehicle.

Q You are out of your vehicle, and





you saw him put his hands in his pockets and then you asked him to remove his hands?

A I don't know if I recall seeing him putting his hands in his pockets. I remember seeing his hands in his pockets and I asked him to remove them.

Q What was his response?

A His response was, I'm not taking my hands out of my pockets.

Q How much time passed before you asked him again?

A Immediately.

Q What did you say?

A I said I need you to please take your hands out your pockets.

Q What did he say?

A I'm not taking them out of my pockets, I'm not doing anything you ask me to do.

Q When was the next time you asked him to take his hands out of his pockets?

A Immediately again, I said, I'm asking you, please to take your hands out of your pockets.

Q How far away from you was Mr. Bottari the third time you asked him to take his





hands out of his pockets?

A He was probably, again, 5 feet on the other side of my patrol vehicle and I was standing at my patrol vehicle. So, 5 feet plus whatever the width of the vehicle is, you know, 8 to 10 feet, maybe. (Indicating)

Q How much time passed from the third time you asked him to take his hands out of his pocket and the fourth time?

A A second or two.

Q What did you say?

A I asked him again, could you please take your hands out of your pockets? I need you to take your hands out your pocket, he said, I am not taking my hands out of my pockets, I am not doing anything you ask me to do.

Q At this time, were you walking towards Mr. Bottari?

A No.

Q Was he walking towards you?

A We were both stationary.

Q Was he looking at you?

A Yes.

Q Were you looking at him?

A Yes.

Q How much time passed between the fourth time you asked him to take his hands out of his pockets and the fifth time?

A Again, it was seconds. I mean like I said, I probably asked him a total anywhere from 6 to 8 times maybe more and each time there was only a second or two between each time I asked him.

Q Did you ever raise your voice at any time?

A No.

Q Did Mr. Bottari ever raise his voice to you?

A Yes.

Q When did Mr. Bottari raise his voice to you?

A He first raised it after I initially asked him to remove his hands and then he kept getting more and more agitated every time I asked him to take his hands out of his pockets.

Q When, did in all of this, did you actually radio for Sergeant Fisher to come?

A I radioed for another patrol unit to come before I exited the vehicle.

Q Is that while you were traveling in a northerly direction along--



A No.

Q What direction was your vehicle traveling at the time you radioed for backup?

A My vehicle wasn't traveling, it was stopped.

Q You stopped the vehicle?

A I stopped the vehicle and engaged Mr. Bottari in a conversation. I said, how are you doing tonight, he said fine. I said what are you doing and then, as I stated before, we went through the whole thing when he said I am not going to tell you my name I'm-- he said-- at that point I put the car in park and I asked for another unit and I exited the vehicle.

Q Was Mr. Bottari moving at the time you were radioing for your backup?

A I believe he was stepping back from the vehicle, from the police vehicle.

Q At that time, were you planning on arresting Mr. Bottari for anything?

A No.

Q When did your decision to arrest Mr. Bottari come into play?

A When he pushed Sergeant Fisher.

Q Let's backup. At no time prior to



Mr. Bottari allegedly pushing Sergeant Fisher, did you have reason to believe that he was committing any criminal act, is that true?

A True.

Q Did Sergeant Fisher, at any time, witness you asking Mr. Bottari to take his hands out of his pockets?

A Yes.

Q You mentioned you asked him approximately 6 times, maybe 8 or 9 or maybe more, correct?

A Correct.

Q How many times had you asked Mr. Bottari to take his hands out of his pockets before Sergeant Fisher arrived?

A I do not know.

Q How many times did you ask Mr. Bottari to take his hands out of his pocket after Sergeant Fisher arrived?

A I do not know.

Q You mentioned that there was a point when Sergeant Fisher basically tried to reason with the defendant and stated to him, something to do with the fact that he is a lawyer and for your safety, that Mr. Bottari should take



his hands out of his pockets, correct?

A Correct.

Q What was Mr. Bottari's response to that?

A His response was fine, you want me to take my hands out of my pockets, I'll take my hands out of my pockets. And that's when he lunged out with his hands out of his pockets. (Indicating)

Q You mentioned that there was a black object and silver or gold object?

A Correct.

Q There was a black object in one hand?

A Yes.

Q And there was a silver or gold object in the other?

A Correct.

Q Have you ever ultimately ascertained what those objects were?

A Yes.

Q What was the black object?

A His wallet.

Q Can you describe it for the court?

A It was a black wallet.

Q What was it made of; leather?
A I believe it was leather, I don't recall exactly.
Q How thick was that wallet?
A I don't know, a standard wallet.
Q Would you say it was approximately three inches wide by four inches in length?
A I don't recall.
Q Did you ever take that into police evidence or custody?
A There may have been pictures taken of it, I don't recall.
Q Is it right now in police custody, to your knowledge?
A Not to my knowledge, no.
Q Did you ultimately identify the--
THE PEOPLE: Your Honor, I'm going to have to object to the question of relevance. This is a suppression hearing not a--
THE COURT: I will allow it.
Q Did you ultimately determine exactly what that object was?
A I believe it was a card case. I don't remember exactly. I think it was a business



card case or a business card holder.
Q Was it rectangular in shape?
A Yes.
Q Was it approximately a quarter of an inch thick?
THE PEOPLE: Again, Your Honor, objection. This is well beyond the scope of this hearing.
THE COURT: Overruled.
Q Was it approximately two and a half inches in length?
A I don't recall.
Q Officer, when you say a card, are you referring to a standard business card? (Indicating)
A It was bigger than a standard business card.
Q Just slightly big enough to contain cards?
A I don't recall.
Q Do you have that object in court with you today?
A No.
Q When exactly did you identify what that object was?



THE PEOPLE: Your Honor, can I object during the course of this proceeding--
THE COURT: No.
THE PEOPLE: What does this have to do with voluntary statements? If Mr. D'Agostino can explain that to me--
THE COURT: I'll explain it to you. The officer testified that the defendant, at some point in time, removed his hands from his pockets and put his hands forward while he had certain things in his hands. Now, the question then is what the officer's reaction or impression was at that point and in order to better understand whether the officer acted properly or not properly at that point in time and thereafter, it is helpful to ascertain, if we can, what was in his hands. What the black, what the silver or gold objects were. Now, the officer has identified them.
THE PEOPLE: Your Honor, with all do respect, again--
THE COURT: Forget it, please sit



down.
Q When, during the course of this entire encounter, did you determine the exact identity of those objects that were in Mr. Bottari's hands?
THE PEOPLE: Objection, Your Honor.
THE COURT: Overruled.
A When he was placed in custody.
Q It was after he was placed in custody?
A Yes.
Q At the time that you stated that after he put his hands back into his pockets that you feared for your safety, correct?
A Correct.
Q Was your fear based on your belief that what he held in his hands could potentially serve as a danger to you in some way?
A Yes.
Q What was your objective when you first apprehended the defendant by grabbing one of his hands?
A I'm sorry. Could you repeat that?
Q You mentioned on your direct case that after Mr. Bottari put his hands back into his

pockets, that you apprehended him by grabbing one of his hands?

A I don't want to say apprehended him. I secured his arm so whatever he did have in his pocket, which at this point was still unknown to me, that he could not remove his hand from his pocket and either harm himself or me or Sergeant Fisher, with whatever he had.

Q When you had his hand at that point, did he still have something in his hand?

A I don't know, he still had his hands in pocket, I couldn't tell.

Q Were you able to remove his hands from his pocket?

A No, he was forcibly holding his arms.

THE COURT: Are you grabbing his hands at that point or his arm?

A I have his forearm.

THE COURT: His forearm because his hands are in his pocket?

A Yes, just above his right and his forearm. (Indicating)

Q Sergeant Fisher had the other arm, correct?



A Yes.

Q What were you trying to do at that point?

A At that point I was trying-- we were trying-- I can't speak for Sergeant Fisher, but I was trying to secure his hand and have him remove his hand from his pocket so we could determine what he had, what he was in possession of.

Q When you first grabbed his hand, what were you physically doing to his hand or to his forearm?

A I was holding it, to secure it.

Q What was Sergeant Fisher doing, to your knowledge?

A To my knowledge he was securing his other arm so that he could, you know, whatever he had in his possession he could not harm us with it, or harm himself.

Q Were you attempting to put your hand into Mr. Bottari's pocket to grab whatever was in it?

A No.

Q Were you attempting to pull his hand out of his pocket?



A No.

Q Was it your intention specifically just to hold Mr. Bottari's forearm for an indefinite period of time?

A No. As I stated before, Sergeant Fisher instructed Mr. Bottari to remove his hands from his pockets and knock him out of his pockets without anything in his hands.

Q But at the time that's not why you were holding his arm. Is it your testimony that while you were holding Mr. Bottari's arm he was instructing you not to take his hands out of his pocket?

A No. If I'm not being clear I had control of his one arm, Sergeant Fisher had control of his other arm.

Q Were you in a standard position at that point?

A Correct.

THE COURT: At that point you had control of one of his arms and Sergeant Fisher had control of the other?

A Correct. Sergeant Fisher instructed him, slowly remove your hands out of your pockets and do not come out of them with



anything in your hands.

Q That is while you had control of one of his arms and he had control of the other?

A Correct.

Q You were telling him to take his hands out of his pockets?

A Correct.

Q Did he respond to that request?

A Yes.

Q He took his hands out of his pocket?

A No, he pulled away from Sergeant Fisher and removed his hands out of his pocket and pushed Sergeant Fisher.

Q It's your testimony that he was able to break free from Sergeant Fisher, correct?

A Correct.

Q Were you able to see how Sergeant Fisher was actually holding his arm at that time?

A I believe, from what I recall, he had a grasp around his forearm. (Indicating)

Q With one hand or two?

A I don't recall.

Q At that time, did you continue to hold the defendant's arm?

A I continued to hold his arm, yes.
Q You continued to exercise control over Mr. Bottari's arm at that time?
A I continued, yes. At that point I didn't know what he had so I continued to hold him.
Q Did Mr. Bottari continue to have the hand that you were holding, in his pocket?
A Yes.
Q Which arm did you physically secure?
A I believe it was his left arm that I came in control of.
Q Is it your testimony that Sergeant Fisher secured his right arm?
A I believe so, yes.
Q Is it your testimony that Mr. Bottari used his right arm to push Sergeant Fisher with his, right arm while you held the left arm?
A Correct.
Q What happened to Sergeant Fisher at the time that Mr. Bottari pushed him? Did he fall to the ground?
A No, he just maybe stepped back, you know, half a step and then went to regain control of his arm and at that point I believe Mr.



Bottari's other arm came out of his pocket because he pulled away from me and then at that point we both tried to gain control of his arms and at which point we fell to the ground.
Q How did you try to regain control of his arm the second time?
A Just try to get a hold of him.
Q How?
A Just trying to grab his arm. (Indicating)
Q Just talking about you specifically, you were trying to simply grab his left arm?
A Again, at that point I am trying to gain control of one of his arms.
Q It's your testimony that the time you fell, that the defendant had been in violation of the Criminal Law was when he pushed Sergeant Fisher, correct?
A Correct.
Q At no time prior thereto, correct?
A Yes.
Q At the time that Mr. Bottari first pushed Sergeant Fisher was after both you and Sergeant Fisher had control of his arms, correct?



A Correct.
Q Your control of the defendant's arms preceded your belief that Mr. Bottari had committed any criminal act?
A Again, I don't know what he had done to that point. He may have committed a crime, I don't know.
Q But your belief is that he had committed a criminal act that began the moment he pushed Sergeant Fisher?
THE COURT: Beg your pardon? Let's define criminal act. I will define it. An act, which is prohibited by the Penal Law of the State of New York, whether it is characterized as a crime or a Penal Law violation. That is what I mean by that and that's the definition and we shall proceed.
So, when he says criminal act, that's the meaning. Something that is contradictory to the Penal Law.
Do you want to ask the question again or have it read back?
MR. D'AGOSTINO: I think that's fair.



Q I would just like to know, based on the Judge's definition of a criminal act, would that in any way change your answer?
A What was my answer, again?
Q Specifically, that the first criminal act that you preceded the defendant to have committed?
A I don't know if he committed a criminal act before that.
Q But it's your perception that I am interested in, not necessarily what--
THE PEOPLE: Objection, Your Honor. I think it has been asked and answered.
THE COURT: Well, he gave an answer and now he seems to be saying he is not sure; he doesn't know. So, I have to allow that to be explained a little further.
Q When you say you are not sure if he committed an act, you mean you're not sure of something that he did prior to you arriving there that may have occurred?
A Correct.
Q But from everything that you saw, the first thing that you saw Mr. Bottari do that

you felt was in some way criminal or in violation of some Penal Statute was when he pushed Sergeant Fisher, correct?

A Well, during my instruction to remove his hands out of his pockets, you know, again, I would have to go back and review the Penal Law. I am asking him to remove his hands from his pockets and he is ignoring my requests.

Q You felt that was a criminal act?

A It may have been. I would have to go back and review the Penal Law.

Q But at the time of the occurrence, did you believe that that was a criminal act? Was he under arrest for that at any point?

A No, not at that point.

Q Let's go back to the point when you stated that Mr. Bottari broke free from your hold of his left arm, were you both standing at that point?

THE PEOPLE: Your Honor, I think we have been through this. What defense counsel is getting at for purposes of voluntary statement, which is what we are here for. The purposes of these questions is to elicit at what point the defendant



was under arrest.

THE COURT: The last question fits in, the other questions I see where they fit in, where they are relevant. I'm not sure about the last one, can we have it read back?

(Whereupon, the last question and answer was read back by the reporter.)

MR. D'AGOSTINO: Can we go off the record for a moment?

THE COURT: Sure.

Q After Mr. Bottari broke free from your grasp, can you describe exactly what happened next?

A I thought I did but, okay. I attempted to grasp control of his arm.

Q How are you attempting to do that?

THE PEOPLE: Your Honor, he all ready asked this question about three times.

THE COURT: I am letting him cover this.

THE PEOPLE: Your Honor, it's already been covered, that's my point. He



has all ready asked that specific question, and I believe the officer testified, well I attempted to grab his arm; well how did you attempt to grab his arm; well, I attempted--

MR. D'AGOSTINO: That's where the objection came in.

THE COURT: We did go into it and I did ask were his hands in his pockets, did you grab the arm or the forearm or the hand, he said the forearm. We did cover that, that was in your cross examination.

MR. D'AGOSTINO: And this is seconds after. This is seconds after that. This is after Mr. Bottari broke free, now Mr. Bottari is free.

THE COURT: Okay, the breaking free part I don't think we got to.

MR. D'AGOSTINO: I want to know how two officers approached one individual and then that individual ended up on the ground with out conclusions and without fast forwarding.

THE COURT: Okay, go ahead.

Q With all due respect officer, I



know this is difficult. If you can imagine that this is a movie I would like to take it frame-by-frame. To the best of your ability I have to know--

THE PEOPLE: I have to object, Your Honor.

THE COURT: Overruled.

THE PEOPLE: This is not a trial.

THE COURT: I don't know, it's not a movie and it's not frame-by-frame. We will finish this within another two moments.

A You are talking about a difference or a time frame of maybe a second or two from the time that he immediately pulls free from Sergeant Fisher and pushes him, to the time that we both begin to struggle for control of his arms and then the three of us fall down.

Q Correct?

A Right.

Q What part of your body came into contact with what part of Mr. Bottari's body next after he broke free?

A I have no idea.

Q You don't remember?

A I don't remember.

Q What part of Sergeant Fisher's body came into contact with what part of Mr. Bottari's body?

A I do not know.

Q How did Mr. Bottari end up face first on the ground?

A I don't know. As I said when we fell down to the ground, Sergeant Fisher was falling first. Mr. Bottari was falling with him and I was-- the three of us went down. From what I saw, Sergeant Fisher landed on his back or on his right shoulder and still trying to hold control of Mr. Bottari's other arm, or whatever arm he had, and the three of us fell to the ground.

Q Did you have any control of Mr. Bottari's arm prior to falling to the ground?

THE PEOPLE: Objection, Your Honor. What does this have to do with this hearing?

THE COURT: We are still on the one point, we already ruled on that. I am not going to rule again. We are still on that moment he is trying to get it frame-by-frame. I don't like the



expression of that but, basically.

To the time that you were all on the ground, and from the time that you were all standing, in that moment, did you reach the ground all three of you reached the ground?

A All three of us reached the ground.

THE COURT: And in reaching, all three of you reaching the ground, were basically you and Sergeant Fisher both holding onto the defendant when you reached the ground?

A From what I recall we all had a hold of each other.

THE COURT: Okay.

A I can't recall what area of Mr. Bottari's body I had a hand on, what area of my body he had a hand on. We were all holding on to one another and I was trying to gain control with one of his arms. Whether I had control, I don't know.

Q Do you remember which one?

A I don't remember which one.

Q During this moment, did you at any time attempt to pat Mr. Bottari's pocket to



determine what had been in them?

A Not until he was placed in custody, no.

Q What part of Mr. Bottari's body came in touch with the ground?

THE PEOPLE: Objection, Your Honor. How would he know that?

THE COURT: Well, because he was there. If he doesn't know, he doesn't know.

A I don't know.

Q Did you see blood?

A Yes.

THE PEOPLE: Objection, this has nothing to do with this hearing. I don't know how many times I can emphasize. It has nothing to do with coercion, it has nothing to do with--

THE COURT: I think we are up to that moment.

Q When you immediately placed the defendant under arrest, what was the charge at that time? What were you arresting him for?

THE COURT: You don't mean what was the charge because there was no form of



charge, obviously.

MR. D'AGOSTINO: I understand but I would like to know what was he arresting him for.

Q What were you arresting him for?

THE COURT: Give me the point in time.

MR. D'AGOSTINO: When they placed Mr. Bottari under arrest.

THE COURT: Let's go back. There is a time when you placed him under arrest. What action did you take to formalize the arrest? Did you say you are under arrest? Did you write a paper down; did somebody else write a paper down?

A I advised Mr. Bottari that he was under arrest.

THE COURT: Okay.

Q What were you arresting him for?

THE COURT: Did you advise him at that time, you said you are under arrest, did you say you are under arrest or did you say you are under arrest because of a, b, c, d, e?

A I distinctly remember, you're under

arrest.

Q For what?

A I don't remember what specific charges at that point in time for what I was charging him with.

Q You did file a police report, correct?

A Yes.

Q In that police report, you indicated that you were arresting him for obstructing governmental administration of justice and disorderly conduct, is that right?

A That is correct.

Q My question is simply whatever word you want to call it, when you had grabbed the defendant and the defendant had fallen to the ground, did that occur before you placed the defendant under arrest or after you placed him under arrest?

A It occurred before.

Q At any time prior to that time, did you attempt to place Mr. Bottari under arrest?

A No.

Q So, the first time you attempted to place him under arrest was after you had already





been involved in that physical struggle with Mr. Bottari?

A No. I tried to place him under arrest as soon as he pushed Sergeant Fisher.

Q With respect to the pushing of Sergeant Fisher, what part of Mr. Bottari's hand pushed what part of Sergeant Fisher?

A I thought I all ready answered that.

Q Did he push him in the face; did he push him in the hand; did he push him in the chest?

A Pushed him in the chest.

Q Did Sergeant Fisher go to Dobbs Ferry Hospital with you?

A No.

Q Did any other police officers accompany you at Dobbs Ferry Hospital?

A No.

Q Were you also injured during the course of this incident?

A No.

Q Was Sergeant Fisher, to your knowledge?

A No.

Q Did either yourself or Sergeant





Fisher receive any medical treatment?

A I don't know if Sergeant Fisher did, but I didn't.

Q You definitely did not?

A I definitely did not.

Q Did you ever complain to anyone in the police department that you had suffered from injuries as a result?

THE PEOPLE: Objection, Your Honor, irrelevant.

THE COURT: Sustained, irrelevant.

Q You mentioned that Mr. Bottari made some statements at Dobbs Ferry Hospital. Do you remember exactly what time that occurred?

A No.

Q Were you questioning the defendant at that time?

A No.

Q Where was the defendant at the time that he spoke?

A We were in the emergency room.

Q You stated that he made some statements, is that correct?

A Yes.

Q Who did he make those statements





to?

A Myself.

Q Who else was in the room at that time?

A Nobody that I recall.

Q It was just you and the defendant in the hospital room?

A That is correct.

Q He was still under arrest at that time, correct?

A Correct.

Q You said he apologized to you?

A Yes.

Q What did he say exactly?

A I believe that he said he was sorry and he said something to the effect that, I should have answered your questions, I had a fight with my wife this evening, I was just down in the parking lot to sleep. I know he apologized numerous times.

Q Did you think that was important information?

A Yes.

Q Did you write it down anywhere?

A I don't recall if I wrote it down. I don't think I wrote it down.

MR. D'AGOSTINO: Your Honor, can I just have one minute to gather my thoughts?

THE COURT: Yes.

MR. D'AGOSTINO: Your Honor, with all do respect, I have no further questions. Thank you.

THE COURT: No redirect?

THE PEOPLE: No, Your Honor.

MR. D'AGOSTINO: Thank you officer.

THE COURT: Do you have any other witnesses?

THE PEOPLE: No, Your Honor.

THE COURT: People rest?

THE PEOPLE: People rest.

THE COURT: You, of course, have the right to call your client as your witness.

MR. D'AGOSTINO: The defendant wishes not to be called at this time. I would like to submit, if possible, a motion, at a minimum, on a later date. I would like to submit some cases and some law, not at this time. I would like to just have a very brief opportunity to just



do a post hearing memorandum and I request this court to reserve.

THE COURT: I am going to reserve.

THE PEOPLE: Your Honor, obviously I just ask if you want something in writing--

THE COURT: Did you want to wait for the transcript?

MR. D'AGOSTINO: Not necessarily.

THE COURT: Because I'm not going to make a decision without the transcript. You might as well wait for the transcript.

THE PEOPLE: Once he gets the transcript and he has a date in mind where he is going to file his memo of law, if you could just give me a call and we can pick a date and I will put something in writing as well.

THE COURT: I'm fine with that.

MR. D'AGOSTINO: Thank you.

THE PEOPLE: Thank you.

(Time noted: 9:40 p.m.)



C E R T I F I C A T I O N

Certified to be a true and accurate transcript of the aforesaid proceeding.

Jennifer A. Luongo

---------------------

Jennifer A. Luongo